**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| JOHN LEAM, GREG DRAYTON, SHANNON MAHONEY, SAMANTHA METTLER, and FRANCESCA MIGNOSI on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> PEPSICO, INC. and THE GATORADE COMPANY, <br><br> *Defendants*. | Case No. _____ |

Plaintiffs JOHN LEAM, GREG DRAYTON, SHANNON MAHONEY, SAMANTHA METTLER, and FRANCESCA MIGNOSI ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following class action complaint (the "Action") against Defendants PEPSICO, INC. ("Pepsi") and THE GATORADE COMPANY ("Gatorade") (collectively, the "Defendants") for violations of state statutes and common law doctrines seeking actual damages, statutory damages, restitution, pre- and post-judgment interest, and reasonable costs and attorneys' fees upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of their counsel as follows:

## INTRODUCTION

1. Pepsi owns Gatorade, the largest producer of sports drinks in the United States and sells products under its ubiquitous "Gatorade" brand. This is a class action on behalf of purchasers of two of the most popular selling versions of Gatorade, the classic Gatorade (just called "Gatorade") and the reduced sugar formulation of Gatorade (hereinafter "RS Gatorade"), which come in numerous different flavors and can be found in almost any grocery store, convenience shop, or gas station (collectively, the "Products").

2. Plaintiffs and Class members, who have purchased these Products, bring this Action because of material representations which are false and misleading: (1) the Products claim to be more hydrating than water – which is and has been proven false; and (2) RS Gatorade claims to have no "artificial flavors, sweeteners, or added colors" which is similarly false because of the inclusion of citric acid as an ingredient. Citric acid is commonly used as an artificial flavor which is, over 99% of the time, commercially produced and is manufactured through a processed derivative of black mold caused *Aspergillus niger* – which causes allergic reactions and disease

1

in humans.[1] Citric acid is also a common cause of various negative side effects including swelling and stiffness, joint pain, muscle pain, stomach pain, and respiratory symptoms.[2]

3.      Defendant's representations to the contrary about hydration and natural flavoring are made in order to induce health-conscious consumers, like Plaintiffs, to purchase these Products.  However, Defendant markets its Products in a way which is systematically misleading and false.

4.      For as long as consumable goods have been sold, "health-washing," which is the instigation of a sale of a consumer product by making it appear healthier than it is, has led consumers to buy products that either do not actually have any health benefits or are, in some cases, harmful.  The instant case is a classic occurrence of health-washing.  Here, Defendant uses false advertising and deceptive conduct which promises health-related benefits.  To compound matters, the misrepresentations made on the Products are not only potentially harmful but command a price premium consistent with these misrepresentations that Plaintiffs and Class members would not have paid had they known that Defendant's representations are false and misleading.  The Products also intentionally contain no warning whatsoever about potential risks and the tendency to cause health risks.

5.      Against this backdrop, Plaintiffs and the Class members, on behalf of themselves and all others similarly situated, bring this Action seeking actual damages, statutory damages, restitution, pre- and post-judgment interest, and reasonable costs and attorneys' fees under state

---

[1] I. Sweis & B. Cressey, *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series for four case reports*, 5 TOXICOLOGY REPS., 808-12 (2018), https://pubmed.ncbi.nlm.nih.gov/30128297/.

[2] *Id.*

2

statutes and common law doctrines due to Defendant's intentional failure to ensure that the Products were distributed, produced, and sold in a manner consistent with advertising. As a result of the foregoing, Plaintiffs and Class members (defined below) were harmed by paying a price premium for the Products which they otherwise would not have paid due to the misrepresentations made about on packaging and in advertising – or would not have purchased the Products at all.

## JURISDICTION AND VENUE

6. *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction over this Action pursuant to the Class Action Fairness Act of 2005 ("CAFA") because there are (a) more than 100 members of the proposed classes, (b) nearly all members of the proposed classes have a different domicile or citizenship from a Defendant, and (c) the claims of the proposed class members exceed $5 million, exclusive of costs and fees.

7. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant because: (1) Defendant Pepsi is headquartered and registered to do business in New York; and (2) Defendant conducts significant business in New York such that they purposefully availed themselves of the privilege of doing business in New York.

8. *Venue.* Venue is proper in this Court because Defendant transacts business within this District, Defendant is domiciled in this District, and a substantial part of the events giving rise to Plaintiffs' claims took place in this District.

## PARTIES

### PLAINTIFFS

#### *Plaintiff John Leam*

9.      Plaintiff Leam is domiciled in Illinois and resides in Gilberts, Illinois.

10.      Plaintiff Leam purchased the Product for himself for personal use during the Class Period.  Plaintiff Leam bought the RS Gatorade variety on multiple occasions in 2026 because he relied on Defendant's representations including that the Product "hydrated better than water" and that the Product was free of artificial flavoring, which it was and is not because the Products he bought contain citric acid.

11.      RS Gatorade is sold at a price premium and is more expensive than other sports hydration drinks.

12.      Plaintiff Leam relied on these misrepresentations – and had he known the truth, he would not have purchased the Products or would have paid significantly less for the Products.

#### *Plaintiff Greg Drayton*

13.      Plaintiff Drayton is domiciled in North Carolina and resides in Concord, North Carolina.

14.      Plaintiff Drayton purchased the Product for himself for personal use during the Class Period.  Plaintiff Drayton bought the RS Gatorade variety on multiple occasions in 2026 because he relied on Defendant's representations including that the RS Product "hydrated better than water" and that the RS Product was free of artificial flavoring, which it was and is not because the Products he bought contain citric acid.

15.      RS Gatorade is sold at a price premium and is more expensive than other sports hydration drinks.

16.　　Plaintiff Drayton relied on these misrepresentations – and had he known the truth, he would not have purchased the Products or would have paid significantly less for the Products.

### Plaintiff Shannon Mahoney

17.　　Plaintiff Mahoney is domiciled in Pennsylvania and resides in Philadelphia, Pennsylvania.

18.　　Plaintiff Mahoney purchased the Products for herself for personal use during the Class Period.　Plaintiff Mahoney bought the RS Gatorade variety on multiple occasions in 2026 because she relied on Defendant's representations including that the RS Products "hydrated better than water" and that the RS Product was free of artificial flavoring, which it was and is not because the Products he bought contain citric acid.

19.　　RS Gatorade is sold at a price premium and are more expensive than other sports hydration drinks.

20.　　Plaintiff Mahoney relied on these misrepresentations – and had she known the truth, she would not have purchased the Products or would have paid significantly less for the RS Products.

### Plaintiff Samantha Mettler

21.　　Plaintiff Mettler is domiciled in Illinois and resides in Genoa, Illinois.

22.　　Plaintiff Mettler purchased the Products for herself for personal use during the Class Period.　Plaintiff Mettler bought the regular Gatorade and the RS Gatorade variety on multiple occasions in 2026 because she relied on Defendant's representations including that both Products "hydrated better than water" and that the RS Gatorade Product was free of artificial flavoring, which it was and is not because the Products he bought contain citric acid.

23.    Gatorade and RS Gatorade are sold at a price premium and are more expensive than other sports hydration drinks.

24.    Plaintiff Mettler relied on these misrepresentations – and had she known the truth, she would not have purchased the Products or would have paid significantly less for the Products.

### Plaintiff Francesca Mignosi

25.    Plaintiff Mignosi is domiciled in California and resides in Simi Valley, California.

26.    Plaintiff Mignosi purchased the Products for herself for personal use during the Class Period. Plaintiff Mignosi bought the regular the RS Gatorade variety on multiple occasions in 2026 because she relied on Defendant's representations including that the RS Products "hydrated better than water" and that the RS Gatorade Product was free of artificial flavoring, which it was and is not because the Products he bought contain citric acid.

27.    RS Gatorade is sold at a price premium and are more expensive than other sports hydration drinks.

28.    Plaintiff Mignosi relied on these misrepresentations – and had she known the truth, she would not have purchased the Products or would have paid significantly less for the Products.

## DEFENDANTS

### Defendant PepsiCo, Inc.

29.    Defendant PepsiCo, Inc. maintains its principal place of business located in Harrison New York.

30.    Upon information and belief, Defendant owns Gatorade which operates independently.

6

31.     Defendant or Defendant's subsidiary or affiliate (Pepsi) markets, manufactures, distributes, sells, or otherwise is responsible for the placement of the Products at their stores both online and at retail.

### Defendant The Gatorade Company

32.     Defendant The Gatorade Company maintains its principal place of business located at 555 W. Monroe St., Chicago, Illinois 60661.

33.     Upon information and belief, Defendant is a subsidiary of Pepsi but operates independently.

34.     Defendant markets, manufactures, distributes, sells, or otherwise is responsible for the placement of the Products at their stores both online and at retail.

## FACTUAL ALLEGATIONS

### The Sports Hydration Drink Industry, Gatorade's History, and the Representations

35.     The sports hydration drink industry is a multi-billion-dollar industry which has a presence across the United States and the world as a whole.  Generally, sports hydration drinks are designed to replace lost water, provide electrolytes, and replenish lost carbohydrates caused by heavy sweating from intense activity.

36.     Gatorade is the monolith within the industry.

37.     Founded in 1965 at the University of Florida for their football team, the Florida Gators.  The goal of the creation of the drink was to provide replacement of lost bodily fluid during extreme physical exercise.  The drink found instant success, with Florida Gators crediting their first Orange Bowl victory in 1967 due to the hydration it provided in extreme heat.  After the 1967 Orange Bowl, the coach of the Gators' opponent stated, "[w]e didn't have Gatorade. That made the difference."

7

38.    Times, however, have changed.

39.    Gatorade now possesses over 60% of the sports hydration drink market share.

40.    Additionally, the initial formulation of Gatorade included only six ingredients: water, sugar, sodium (salt), potassium phosphate, and lemon juice.  And, at the time, the drink was deemed effective for replenishment during extreme exercise.

41.    However, today is a different story.  Gatorade now has many more ingredients, many of which are synthetic: water, sugar, dextrose (a sweetener), citric acid, salt, sodium citrate, monopotassium phosphate, gum arabic, ester of rosin, natural flavor, and yellow 5.

42.    Gatorade's branding has changed as well.  Initially Gatorade merely called itself a Thirst Quencher, which can be seen in both older and newer bottles:



**IMAGE 1:** Old Formulation Gatorade



**IMAGE 2:** Newer Formulation Gatorade

43.    To be clear, there are no issues with the packaging for either of these versions of Gatorade. The issues arise with Gatorade's newest packaging for the Products, which is both false and misleading.

9

44.    The newest packaging (which is at issue) appears as follows:



**IMAGE 3:** Most Recent Packaging for Standard Gatorade

45.    As can be seen above, the most recent packaging states "HYDRATES **BETTER THAN WATER**" which is problematic because it is untrue; as explained below (emphasis not added).

10

46.    Additionally, the packaging for the RS Gatorade appears as follows below:



**IMAGE 4:** Most Recent Packaging for Reduced Sugar Gatorade

47.    As can be seen above, the most recent packaging states "HYDRATES **BETTER**

THAN WATER" which is similarly problematic to standard Gatorade because it is untrue (also

**11**

explained below) (emphasis not added); but also, the label promises "NO ARTIFICIAL FLAVORS, SWEETENERS, OR COLORS FROM ARTIFICIAL SOURCES" which is demonstrably false given that citric acid is the third listed ingredient.

48.    The representations that are made on the Products' packaging are critical because consumers, like Plaintiffs and Class members, rely on them when they make their purchases. This is especially when a consumer chooses to buy a sports hydration drink because those beverages are associated with health-related purposes. Further, consumers, like Plaintiffs and Class members, who buy the RS Gatorade version do so because they are looking for not just a healthy option, but one that specifically is even healthier than the average standard Gatorade, let alone any other sports hydration drink.

### Gatorade Misleads Consumers

49.    Gatorade's representations as discussed herein are misleading to consumers in a material way.

50.    ***Gatorade Is Not As Hydrating As Water.*** Gatorade currently advertises on its Products that Gatorade "hydrates better than water" and even boldens this representation.

51.    As medically reviewed articles about Gatorade state:

> … many people use sports drinks like Gatorade for daily hydration, which is not they are intended for. There isn't strong research showing the benefits of sports drinks for low-intensity exercise lasting less than an hour… plain water is usually the best choice.[3]

52.    In fact, the same medically reviewed article warns against using Gatorade stating, "a 28-ounce bottle of Gatorade [] contains 48 grams of added sugar. This exceeds the American Heart Association's recommended daily limit for added sugar, which is 36 grams for men and 25

---

[3] https://www.health.com/does-gatorade-hydrate-you-11754011, (last accessed May 20, 2026).

grams for women.  Consuming too much added sugar can lead to weight gain, obesity, type 2 diabetes, and heart disease."  And yet, Gatorade makes no warning about this.

53.     Additionally, the article states, "[a] 28-ounce bottle of Gatorade contains 380 milligrams of sodium.  This is 17% of the daily recommended limit […] diets high in sodium have been linked to high blood pressure, a risk for heart disease and stroke."  Gatorade makes no warning of this either.  In fact, by warranting that Gatorade is a better choice than water, it misleads consumers to use a product which may have deleterious effects which water does not cause.

54.     Even Gatorade's own website contradicts its advertising on packaging.

55.     Gatorade's website has a February 24, 2026 article titled "How Gatorade Works & Why It Can Hydrate Better Than Water" which, on its own, is much less of an assertion as made on packaging through less confident, more tailored language (by using the word "can").[4] That article states "when it comes to hydration, water is essential.  But during longer or more intense workouts, your body loses more than just fluid, it loses electrolytes and energy."  The article recommends supplementing water with Gatorade and that it is best when used after exercise sessions longer than 60 minutes.  According to the CDC, the majority of Americans only need to work out for about 21 minutes at a time, which falls well short of the intensity Gatorade claims necessitates its use.[5]  As Gatorade's own article states, "the goal isn't to replace water" which is far afield from the representation on packaging that it hydrates better than water – which consumers would reasonably rely upon at the marketplace, as Plaintiffs and Class members did.

---

[4] https://www.gatorade.com/resources/how-gatorade-works-and-why-it-can-hydrate-better-than-water?from=resources/news-updates, (last accessed, May 20, 2026).
[5]  https://www.cdc.gov/physical-activity-basics/guidelines/adults.html, (last accessed May 20, 2026).

56.    ***The Presence of Artificial Flavors in the RS Gatorade Products.***  Gatorade currently advertises its RS Gatorade Products as being free of artificial flavors, but this is false.

57.    As Gatorade lists as its fourth ingredient on the RS Gatorade Products, these Products contain citric acid, which is an artificial ingredient.  Not only is it artificial, but it can be deleterious to human health – which is in stark contrast to the very health-motivated reasons why Plaintiffs and Class members would buy a sports hydration drink.  Plaintiffs and Class members relied on the representation that this set of Products was free of artificial flavors, as boldly advertised on the label.

58.    However, this is false.

59.    The ingredients appear as follows:

WATER, SUGAR, CITRIC ACID, SODIUM CITRATE, SALT, NATURAL FLAVOR, MONOPOTASSIUM PHOSPHATE, PURIFIED STEVIA LEAF EXTRACT, VEGETABLE JUICE (COLOR), MODIFIED FOOD STARCH, GLYCEROL ESTER OF ROSIN.

60.    It is well-known that citric acid can occur naturally when derived from certain citrus products – but this is not true of the citric acid which is contained in the Products, which is commercially made and is therefore artificial.[6]  More than 99% of commercially produced citric

---

[6] A. Hesham, Y. Mostafa & L. Al-Sharqi, *Optimization of Citric Acid Production by Immobilized Cells of Novel Yeast Isolates*, 48 MYCOBIOLOGY 122, 123 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7178817/;

R. Ciriminna et al., *Citric Acid: Emerging Applications of Key Biotechnology Industrial Product*, 11 CHEMISTRY CENT. J. 22 (2017), at 1, https://doi.org/10.1186/s13065-017-0251-y ("[P]roduction of citric acid from lemon juice ... started to decline [in the early 1900s] due to the introduction of the commercial production ....");

acid is manufactured through a processed derivative of black mold, *Aspergillus niger*, which can cause the aforementioned health issues in humans – including, swelling, stiffness, joint pain, muscle pain, stomach plan and respiratory symptoms.

61.    According to a technical evaluation report for citric acid as authored by the United States Department of Agriculture's Marketing Services ("USDA AMS") it is not commercially feasible anymore for natural citric acid to be extracted from fruits, stating the creation of citric acid "[t]raditionally, by extraction from citrus juice [is] no longer commercially available.  It is now extracted by fermentation of a carbohydrate substance (often molasses) and by a citric acid bacteria, *Aspergillus niger* (black mold) or *Candida guilliermondii* (yeast).  Citric acid is recovered from the fermentation broth by a lime and sulfuric acid process in which the citric acid is first precipitated as a calcium salt and then reacidulated with sulfuric acid."

62.    As a reviewer for the USDA AMS stated "[citric acid] is a natural[ly] occurring substance that commercially goes through numerous chemical processes to get to its final usable form.  This processing would suggest it is synthetic."

63.    According to the FDA, it is determined that manufactured citric acid is not naturally occurring, it is artificial.  The FDA has even sent warning letters to other companies who have failed to make this distinction which misleads consumers.  Specifically, in warning

---

K. Kirimura, Y. Honda, & T. Hattori, *Citric Acid*, 3 COMPREHENSIVE BIOTECHNOLOGY 135 (2011),
https://www.sciencedirect.com/science/article/pii/B9780080885049001690 ("Citric acid is *exclusively produced* by fermentation with the filamentous fungus *Aspergillus niger*.") (emphasis added);

Walid A. Lofty et al., *Citric Acid Production by a Novel* Aspergillus niger *Isolate: II. Optimization of Process Parameters Through Statistical Experimental Designs*, 98 BIORESOURCE TECH. 3470 (2007), available at
https://www.sciencedirect.com/science/article/abs/pii/S0960852406005943 ("demand can only be satisfied by biotechnological fermentation processes").

letters sent to Hirzel Canning Company and Oak Tree Farm Dairy, Inc., the FDA stated that its policy is that a product is not natural if it contains citric acid.

64.    These are the types of industrial systems used to create citric acid:



65.    This would deem Gatorade's use of citric acid to be artificial, and which renders its advertising to be false and misleading to a reasonable consumer with respect to the RS Products.

16

**CONSUMER HARM**

66.     Due to the significant number of sales of the Products, there are likely tens of thousands of consumers who have purchased and are continuing to purchase the Products distributed, marketed, produced, and sold by the Defendant.

67.     Given that the Products do not have provide more hydration than water and the RS Products contain artificial flavors, which do not comport with their packaging. As a result, consumers, like Plaintiffs and Class members, are entirely misled into buying the Products and even to pay a premium for these items.  Furthermore, the deleterious health impacts and risks consuming Gatorade instead of water is a material fact omitted on packaging which further harms reasonable consumers, including Plaintiffs and Class members.

68.     As such, Plaintiffs and Class members were harmed in the form of the monies they paid for the Products which they would not have otherwise paid had they known the truth.

**CLASS ACTION ALLEGATIONS**

69.     Plaintiffs bring this Action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23, seeking certification of the proposed classes (collectively, the "Class"):

> **Nationwide Class**: All persons within the United States who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

70.     Additionally, Plaintiffs bring this Action on behalf of the following subclasses:

> **California State Sub-Class**: All persons within the State of California who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

> **Illinois State Sub-Class**: All persons within the State of Illinois who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

17

**North Carolina State Sub-Class**: All persons within the State of North Carolina who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

**Pennsylvania State Sub-Class**: All persons within the State of Pennsylvania who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

71.    Excluded from the proposed Class are Defendant and any such entities in which the Defendant has a controlling interest, the Defendant's agents, employees and legal representatives, any judge or judicial officer to whom this matter is assigned and any member of such judge or judicial officers' staff and immediately family, as well as all resellers of the Products.

72.    *Numerosity*.  The members of the Class are so numerous that joinder would be inefficient and impracticable.  Based upon Defendant's annual sales statistics, there are at least tens of thousands of Class members across the country.

73.    *Commonality*.  There are common questions of law and fact relevant to the Class, and these questions predominate over any questions affecting individual Class members.  These common questions of law and fact include, without limitation:

    i.   Whether Defendant violated state and common law statutes and doctrines;

    ii.  Whether Defendant engaged in the conduct as alleged;

    iii. Whether Defendant breached express warranties;

    iv.  Whether Defendant failed to warn of the risks that followed the foreseeable use of its Products;

    v.   Whether Defendant was unjustly enriched;

**18**

vi.  Whether Plaintiffs were harmed;

vii.  The measure of damages to Plaintiffs and Class members; and,

viii.  Whether Plaintiff is entitled to declaratory and injunctive relief.

74.  ***Typicality***.  Plaintiffs claims are typical of those of other Class members because Plaintiffs, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiffs, like all other Class members, was injured by Defendants' uniform conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiffs.  The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

75.  ***Adequacy of Representation***.  Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class.  Plaintiffs have retained counsel experienced in consumer protection class action litigation, and Plaintiffs intend to prosecute their action vigorously.

76.  ***Superiority of Class Action***.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in

**19**

individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

77. The litigation of the claims brought herein is manageable. Defendant' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

78. Adequate notice can be given to Class members directly using information maintained in the parties' records.

79. *Predominance*. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

80. This proposed class action does not present any unique management difficulties.

## FIRST THROUGH FIFTH CAUSES OF ACTION

**VIOLATIONS OF CONSUMER PROTECTION LAWS**

**NEW YORK'S CONSUMER PROTECTION LAW**
**N.Y. GEN. BUS. LAW § 349 ("GBL § 349")**
(ON BEHALF OF THE NATIONWIDE CLASS)

**CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**("CLRA)**
(ON BEHALF OF THE CALIFORNIA SUBCLASS)

**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**("ICFA")**
**815 ILCS 505/1 *et seq.***
(ON BEHALF OF THE ILLINOIS SUBCLASS)

**NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**N.C. CODE § 75-1.1**
(ON BEHALF OF THE NORTH CAROLINA SUBCLASS)

**PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**("UTPCPL")**
**73 P.S. SECTIONS 201-1 *et seq.***
(ON BEHALF OF THE PENNSYLVANIA SUBCLASS)

**\*AND ALL SUBSTANTIALLY SIMILAR STATUTES\***

81.    Plaintiffs repeat the allegations in Paragraphs 1-80 as if fully set forth with the same force herein.

82.    For purposes of GBL § 349, the CLRA, ICFA, NCUDTPA, and UTPCPL (the "UDAP Statutes"), Defendants are considered a business, and Plaintiffs (as well as Class members) are considered consumers.

83.    The UDAP Statutes prohibit deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service.

21

84. Defendants committed deceptive acts or practices by employing false, misleading, and deceptive representations and/or omissions about the presence (or risk of a presence) the health and efficacy of the Products.

85. Information as to the content in each of their Products was in the exclusive control of Defendants. Plaintiffs could not possibly have known that the representations made on packaging as aforementioned were not only false, but misleading.

86. Because Plaintiffs bought these Products numerous times, Plaintiffs have standing to pursue this claim because they each have suffered an economic injury due to lost money or property as a result of Defendants' acts or practices. When Plaintiffs purchased the Products, they relied on false, misleading and deceptive representations that the Products consistent with advertising on packaging. Plaintiffs spent money in the transaction that she otherwise would not have spent had she known the truth about Defendant's Products.

87. Defendants' conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations. Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – belief that they were free of artificial flavors and/or more hydrating than water is.

88. Defendants knew that this health information about its Products, which are specifically marketed toward health-conscious consumers, remain material to these types of consumers. As a result of its deceptive acts and practices, Defendants sold millions of bottles of the Products to unsuspecting consumers nationwide, as well as to thousands of unsuspecting consumers Nationwide, and in California, Illinois, New York, Pennsylvania, and North Carolina.

89. As a direct and proximate result of Defendants' false, misleading and deceptive representations and/or omissions, Plaintiffs and Class members were injured in that they: (1)

overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and (3) were deprived of the benefit of their bargain because the Products they purchased had less value than if Defendants had adequately disclosed the risks of consumption and the correlation to health problems as stated above.

90.    On behalf of themselves and Class members, Plaintiffs seek to enjoin Defendants' unlawful acts and practices – as well as to have warnings added to the packaging of the Products.

91.    Additionally, on behalf of themselves and Class members, Plaintiffs also seek to recover their actual damages, statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees.

92.    With respect to the Second Cause of Action, Plaintiffs will amend their Complaint to give notice regarding the applicability of damages under the CLRA after a 30-day window to cure.

## SIXTH AND SEVENTH CAUSES OF ACTION

## VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW
## N.Y. GEN. BUS. LAW § 350 ("GBL § 350")

### (ON BEHALF OF THE NATIONWIDE CLASS)

## VIOLATIONS OF CALIFORNIA's FALSE ADVERTISING LAW
## CAL. BUS. AND PROF. CODE § 17500 ("FAL")
## *AND ALL SUBSTANTIALLY SIMILAR STATE STATUTES*

### (ON BEHALF OF THE CALIFORNIA SUB CLASS)

93.    Plaintiffs repeat the allegations in Paragraphs 1-80 as if fully set forth with the same force herein.

94.    Defendants engaged in a campaign of false and misleading advertising and marketing with regard to the health of its Products to deceive consumers into believing that the Products were more hydrating than water and were free of artificial flavoring – when, in reality, this was untrue.

95.    Because Plaintiffs bought these Products numerous times, Plaintiffs have standing to pursue this claim because they both have suffered an economic injury due to lost money or property as a result of Defendants acts or practices.  When Plaintiffs purchased the Products, they both relied on false, misleading and deceptive representations, as well as omissions to the contrary, which led them to believe that the Products as advertised on packaging.  Plaintiffs spent money in the transaction that they otherwise would not have spent had she known the truth about Defendants Products.

96.    Defendants' conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations.  Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – belief that they were healthy and consistent with advertising on packaging.

24

97.    Defendants knew that this health information about its Products, which are specifically marketed toward health-conscious purchasers, are material to consumers.  As a result of its false advertising, Defendants sold millions of bottles of the Products to unsuspecting consumers nationwide.

98.    As a direct and proximate result of Defendants' false, misleading and deceptive representations and/or omissions, Plaintiffs and Class members were injured in that they: (1) overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendants had adequately disclosed the truth about them.

99.    On behalf of themselves and Class members, Plaintiffs seek to enjoin Defendant's unlawful acts and practices.  On behalf of herself and Class members, Plaintiffs also seek to recover her actual damages or $500.00 in statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION

### BREACH OF WARRANTY

UCC § 2-725 – BREACH OF WARRANTY
(ON BEHALF OF THE NATIONWIDE CLASS)

100.    Plaintiffs repeat the allegations in Paragraphs 1-80 as if fully set forth with the same force herein.

101.    Defendants made affirmations of fact and promises to consumers, including Plaintiffs and the Class, that the Products were made for daily consumption and which had positive health benefits consistent with that consumption.  However, these affirmations of fact and promises to consumers were false and misleading.

102.    The natural tendency of these affirmations of fact and promises by the Defendant were to induce consumers, such as Plaintiffs and Class members to purchase Defendant's Products at a premium price and were a basis of the bargain pursuant to which Plaintiff and Class members to purchase Defendant's products to their detriment.  Defendant therefore created an express warranty that Defendant's products conformed to these affirmations and promises.

103.    Defendant violated this express warranty by selling products which were mislabeled and subsequently lacked critical nutrients and which even had a correlative tendency to cause medical issues.

104.    As a proximate result of the breach of warranties by Defendant, Plaintiffs and Class members did not receive goods as warranted and did not receive the benefit of the bargain.  They have been injured and have suffered damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### FAILURE TO WARN

105.    Plaintiffs reallege the allegations of Paragraphs 1-80 as if fully set forth herein.

106.    It is the responsibility of manufacturers of products (and which extend to the original or ultimate purchaser of a product) to warn of foreseeable and unreasonable risks of harm; privity need not exist.  These claims depend on reasonableness and public policy concerns at the heart of the purchasing transaction.

107.    In this instance, Defendants were in unique control over the facts – that their Products have an actual tendency to increase the possibility of health issues due to the consumption of citric acid as well as sugary beverages like the Products.  Despite this knowledge, Defendant completely fails to warn Plaintiffs and Class members of this risk.

108.    Plaintiffs seek all available forms of damages, including injunctive relief with respect to labeling and warnings, that are available in New York under the tortious act of failure to warn.

## TENTH CAUSE OF ACTION

### UNJUST ENRICHMENT

### *IN THE ALTERNATIVE TO THE BREACH OF WARRANTY CLAIMS*

(ON BEHALF OF THE NATIONWIDE CLASS AND NEW YORK SUB-CLASS)

109.    Plaintiffs reallege the allegations of Paragraphs 1-80 as if fully set forth herein.

110.    Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

111.    Defendants received benefits from Plaintiff and Class members in the form of the Plaintiffs and Class members' compensation Plaintiffs provided for the Products.

112.    These purchases provided the Defendants with economic, intangible, and other benefits, including money.

113.    Had Plaintiffs and Class members known of Defendant's misconduct, they would not have paid for the Products or would have paid less for the Products.

114.    Defendants unjustly retained these benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

115.    The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members.  It would be inequitable for Defendants to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Action.

116.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**<u>REQUEST FOR RELIEF</u>**

117.    Plaintiffs, on their own behalf and on behalf of the Class and the Sub-Class, requests the following relief:

    a.    An order certifying the Class and the Sub-Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class and Sub-Class Representatives and their attorney as Class Counsel;

    b.    A declaration that Defendant are financially responsible for notifying Class and Sub-Class members of the pendency of this suit;

28

c.  An order declaring that Defendant's conduct violates the consumer protection statutes cited;

d.  Actual damages;

e.  Statutory damages;

f.  An order providing appropriate equitable relief in the form of an injunction against Defendant's unlawful and deceptive acts and practices, and requiring proper, complete, and accurate representation and labeling of the Products;

g.  Pre- and post- judgment interest on all amounts awarded;

h.  Other injunctive relief as the Court may deem appropriate; and

i.  An order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

118.  Plaintiffs hereby demands a trial by jury.

DATED: May 21, 2026                       YAGMAN PLLC

/s/ *Blake Hunter Yagman*
Blake Hunter Yagman
FOREST HILLS TOWER
118-35 Queens Boulevard, Suite 444
Forest Hills, New York 11375
*blake.yagman@yagmanpllc.com*
Tel: (929) 709-1493

*Attorney for Plaintiffs* JOHN LEAM, GREG DRAYTON, SHANNON MAHONEY, SAMANTHA METTLER, and FRANCESCA MIGNOSI *and the Proposed Classes*

29