**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

*In re Gatorade Marketing & Sales Practices Litigation*

Case No. 7:26-cv-04258-JGLC

**CONSOLIDATED CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

## TABLE OF CONTENTS


**Page**

INTRODUCTION ..... 1

JURISDICTION AND VENUE ..... 6

PARTIES ..... 7

I. PLAINTIFFS ..... 7

II. DEFENDANTS ..... 16

THE PRODUCTS ..... 17

FACTUAL ALLEGATIONS ..... 18

I. GATORADE AND THE SPORTS HYDRATION DRINK INDUSTRY ..... 18

II. THE NO ARTIFICIAL MISREPRESENTATIONS ..... 19

A. Defendants Prominently Represent That the "No Artificial" Products Contain No Artificial Flavors ..... 19

B. Defendants Repeat the "No Artificial" Representations Across Every Channel Through Which They Sell ..... 21

*C.* The Citric Acid in the Products Is Manufactured, Not Naturally Derived ..... 28

D. The Sodium Citrate in the Products Is a Second Manufactured Flavoring ..... 33

E. The Manufactured Citric Acid and Sodium Citrate in the Products Are Flavorings ..... 35

F. Federal Regulators and Federal Courts Have Repeatedly Recognized That Manufactured Citric Acid Defeats a "Natural" Claim ..... 38

III. THE HYDRATION MISREPRESENTATION ..... 39

A. Defendants Represent That the Products Hydrate Better Than Water ..... 39

B. The Hydration Representation Is False for the Overwhelming Majority of Consumers ..... 41

IV. MATERIALITY OF BOTH REPRESENTATIONS ..... 42

V. CONSUMERS' INABILITY TO DISCOVER THE TRUTH ..... 44

VI. DEFENDANTS' KNOWLEDGE ..... 44

VII. THE PRICE PREMIUM AND RESULTING INJURY ..... 46

CLASS ALLEGATIONS ..... 47

COUNT I ..... 51

COUNT II ..... 53

COUNT III ..... 55

COUNT IV ..... 56

COUNT V ..... 58
COUNT VI ..... 60
COUNT VII ..... 60
COUNT VIII ..... 61
COUNT IX ..... 63
COUNT X ..... 64
PRAYER FOR RELIEF ..... 66
DEMAND FOR JURY TRIAL ..... 67

Plaintiffs Marian Greenberg Ulberg, John Leam, Shannon Mahoney, Francesca Mignosi, Michael Walsh, Philip Smith, Caitlin Darr, and Alex Kononenko (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Consolidated Class Action Complaint ("Complaint") against Defendants PepsiCo, Inc. ("PepsiCo"), The Gatorade Company ("Gatorade"), and Stokely-Van Camp, Inc. ("Stokely-Van Camp," together with PepsiCo and Gatorade, "Defendants"), alleging violations of state and common laws. Plaintiffs seek all available forms of damages and all other relief available under the various state statutes and common laws. The allegations are made upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters:

## INTRODUCTION

1. This class action is brought on behalf of purchasers of certain Gatorade products that Defendants label, advertise, and sell as containing "no artificial flavors, sweeteners, or added colors," as "naturally flavored," and/or as "hydrat[ing] better than water" (the litigation is hereinafter referred to as the "Action"). Specifically, the challenged representations appear on: Gatorade Lower Sugar Electrolyte Sports Drink ("Lower Sugar Gatorade") and Gatorade Zero Powder Sticks ("Gatorade Powder") (together, the "'No Artificial' Products"), as well as Gatorade Thirst Quencher ("Classic Gatorade") and Gatorade Zero Sugar Thirst Quencher ("Gatorade Zero") (collectively, the "Products"). These Products are sold online and at retail locations throughout the United States. Each of the Products alleged herein are substantially similar and the violations alleged in this Action stem from similar violations of law tied to the similar marketing of these Products.

2. The scheme began in March 2026 when Defendants announced their "Lower Sugar" Gatorade line, which they billed as "a new era of hydration with no artificial flavors,

sweeteners or colors," targeting "active consumers."[1] That announcement was the centerpiece of a nationwide marketing campaign built around the representation that the Products are free of artificial flavoring, sweetener, or color ingredients and "hydrate[] better than water."[2] Each of these representations are false for independent reasons and each is pleaded separately herein.

3. ***First***, Defendants prominently misrepresent on the "No Artificial" Products' front labels that the Products contain "no artificial flavors, sweeteners, or added colors," "no artificial flavors, sweeteners, or colors from artificial sources," "no added colors or artificial flavors," and/or that the "No Artificial" Products are "Naturally Flavored" or "Naturally Flavored with Other Natural Flavors" ("'No Artificial' Representation(s)"). Defendants reinforce those claims with photorealistic color images of whole fresh fruit placed directly alongside the "No Artificial" claims, and repeat the misstatements on Gatorade.com, in video advertising, on Defendants' social media accounts, through paid athletes and influencers, and on retail platforms (*e.g.*, the Amazon, Walmart, and Target websites) where the claim is embedded in the "No Artificial" Products' names.

4. The "No Artificial" Representations are false and misleading because the "No Artificial" Products are flavored with manufactured (synthetic) citric acid and sodium citrate. Both ingredients appear among the top five ingredients of each "No Artificial" Product, listed ahead of "natural flavor," and in several "No Artificial" Products, citric acid is the single most predominant

---

[1] *Gatorade Lower Sugar brings a new era of hydration with no artificial flavors, sweeteners or colors and 75% less sugar than Gatorade Thirst Quencher* ("*Gatorade Lower Sugar brings a new era of hydration with no artificial flavors*"), PEPSICO (Mar. 4, 2026), https://www.pepsico.com/newsroom/press-releases/2026/gatorade-lower-sugar-brings-a-new-era-of-hydration-with-no-artificial-flavors-sweeteners-or-colors.

[2] *Id*.

ingredient by weight. If either manufactured citric acid or sodium citrate is removed or substantially reduced, the taste of the "No Artificial" Products is materially altered.

5. The "No Artificial" misrepresentations are also material to reasonable consumers. Nearly two out of three consumers report that ingredients have at least a moderate influence on their food and beverage purchases, and approximately half of all United States consumers, and 79% of health-focused shoppers report that they are worried about health risks from artificial ingredients and chemicals in foods.[3]

6. ***Second***, Defendants print across the front of every bottle of each of the Products the unqualified claim "HYDRATES BETTER THAN WATER." This "Hydration Representation" is false and misleading for most consumers because any hydration advantage the Products have over water arises only when a consumer is losing fluid, electrolytes, and carbohydrates through sustained sweating, such as during prolonged or intense exercise.

7. Defendants know that the Hydration Representation is false for most consumers. In a February 24, 2026, article titled "How Gatorade Works & Why It Can Hydrate Better Than Water" Defendants admit that the benefit only arises "[d]uring exercise, especially sessions longer than 60 minutes," that "[w]ater replaces fluid," and that "the goal isn't to replace water."[4]

8. Defendants' own history confirms their knowledge, as well. Gatorade was developed in 1965 by a team of researchers at the University of Florida led by Robert Cade for the

[3] Lauren Manning, *Consumers are paying more attention to ingredient lists, report finds*, FOOD DIVE (June 18, 2021), https://www.fooddive.com/news/consumers-are-paying-more-attention-to-ingredient-lists-report-finds/601925/; *see also* Danielle Romano, *U.S. Shoppers Are Concerned About Artificial Ingredients in Food*, CONVENIENCE STORE NEWS (Mar. 2, 2026), https://csnews.com/us-shoppers-are-concerned-about-artificial-ingredients-food.

[4] *How Gatorade Works & Why It Can Hydrate Better Than Water*, GATORADE (Feb. 24, 2026), https://www.gatorade.com/resources/how-gatorade-works-and-why-it-can-hydrate-better-than-water (emphasis added).

school's football team to replenish the carbohydrates they burned and the water and electrolytes they lost in sweat during vigorous athletic activities. The Products' labels, however, carry no such qualification. Stripped of the conditions on which it depends, the unqualified representation that the Products "HYDRATE BETTER THAN WATER" conveys to reasonable consumers that the Products are superior to water in all circumstances. They are not. Most consumers do not drink the Products while losing fluid, electrolytes, and carbohydrates through sustained sweating, and for those consumers the Products do not hydrate better than water.

9. Research shows that consumers who would pay more for sports beverages offering benefits beyond sports performance are more likely to identify themselves as regular exercisers but non-athletes (37%) or less regular exercisers (38%) than as athletes (29%),[5] and 31.3% of American adults reported consuming a sports or energy drink within the prior seven days[6].

10. The Hydration Representation is also material to reasonable consumers. Indeed, hydration is the single most desired health benefit consumers seek from foods and beverages, and the leading reason consumers give for purchasing a particular food or beverage.[7] Moreover, 56% of consumers report that hydration shapes their beverage choices.[8]

---

[5] *Sports Beverage Market Flexes*, FOOD TECHNOLOGY MAGAZINE (January 25, 2024), https://www.ift.org/food-technology-magazine/sports-beverage-market-flexes (reporting Mintel data).

[6] Sohyun Park, *et al*., *Characteristics Associated with Consumption of Sports and Energy Drinks Among US Adults: National Health Interview Survey*, 2010, 113 J. ACAD. NUTRITION & DIETETICS 112 (2013), https://pubmed.ncbi.nlm.nih.gov/23260728/.

[7] *The Future of Water: Top Ten Trend #9*, INNOVA MARKET INSIGHTS (Apr. 18, 2024), https://www.innovamarketinsights.com/trends/the-future-of-water/.

[8] *Taste Still Drives Beverage Choice Among Consumers, Along with Hydration, Nutrition and Simplicity*, FOOD NAVIGATOR (Aug. 21, 2023), https://www.foodnavigator.com/Article/2023/08/21/Taste-still-drives-beverage-choice-among-consumers-along-with-hydration-nutrition-and-simplicity/.

11. Defendants nonetheless placed both the “No Artificial” and Hydration Representations on the front primary display panel of the Products in the largest and boldest type on the package because Defendants know consumers rely on these claims and will pay more for the promised attributes. Defendants thereby exploit consumers’ preference for beverages free of artificial flavoring ingredients and for products that deliver the hydration benefits Defendants promise, at the expense of both unwitting consumers and Defendants’ law-abiding competitors, over whom Defendants have gained an unfair competitive advantage.

12. Consumers, including Plaintiffs, rely on Defendants’ labeling and advertising to be truthful, particularly given Gatorade’s longstanding reputation in the sports drink category. Reasonable consumers do not possess the specialized knowledge required to determine whether a given ingredient is a manufactured flavoring agent or to evaluate a comparative hydration claim, and they cannot discover the falsity of Defendants’ representations at the point of sale. Plaintiffs and Class members therefore paid a price premium for the Products, and had they known the truth, they would not have purchased the Products or would have paid substantially less for them.

13. Plaintiffs bring this Action individually and on behalf of similarly situated consumers who purchased the Products during the Class Period.[9] Plaintiffs seek recovery of the price premium they and Class members overpaid for Products that do not comport with the challenged representations, including damages, restitution, disgorgement, and any applicable penalties, fines, or punitive damages, to the extent the causes of action pleaded herein permit such recovery, as well as any other relief available under the relevant statutes and common law or otherwise deemed proper by the Court.

[9] The “Class Period” is the period beginning on the earliest date permitted by the longest applicable statute of limitations for each claim asserted, through the date of judgment or until the conduct alleged herein ceases.

**JURISDICTION AND VENUE**

14. This Court has original jurisdiction over this Action under 28 U.S.C. § 1332(d)(2). The proposed Class consists of millions of individual purchasers nationwide. The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs. At least one proposed Class Member is a citizen of a state different from Defendants.

15. This Court has personal jurisdiction over Defendants. PepsiCo maintains its principal place of business in this District and is therefore at home here. Gatorade Co. and Stokely-Van Camp market, distribute, and sell the Products throughout New York and within this District, have purposefully availed themselves of the privilege of conducting business in New York, and have sufficient minimum contacts with this forum such that the exercise of jurisdiction comports with due process. The claims asserted herein arise out of and relate to those contacts.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because PepsiCo resides in this District, Defendants transact substantial business in this District, and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, including the development, approval, and nationwide dissemination of the challenged labeling and marketing.

17. This Consolidated Class Action Complaint is filed pursuant to the Court's July 31, 2026 Order (ECF No. 29) consolidating the above-captioned actions and appointing Interim Co-Lead Class Counsel, and supersedes the complaints filed in the constituent actions: *Leam v. PepsiCo, Inc.*, No. 7:26-cv-04258 (S.D.N.Y.); *Walsh v. PepsiCo, Inc.*, No. 7:26-cv-05191 (S.D.N.Y.); *Darr v. The Gatorade Co.*, No. 1:26-cv-06075 (N.D. Ill.); and *Kononenko v. PepsiCo, Inc.*, No. 5:26-cv-05731 (N.D. Cal.). Plaintiffs file this pleading pursuant to the Court's Order and not as a unilateral amendment under Rule 15(a), and Plaintiffs do not waive, and expressly preserve, their right to seek leave to amend.

## PARTIES

### I. Plaintiffs

18. ***Plaintiff Marian Greenberg Ulberg*** is a citizen of New York, residing in Oakdale, New York, at all relevant times.

19. During the Class Period, Plaintiff Greenberg Ulberg purchased the Products for personal, family, or household use, and not for resale. In or around June 2026, Plaintiff Greenberg Ulberg purchased the Lower Sugar Gatorade in the Fruit Punch flavor, and the Regular Gatorade in the Fruit Punch and Glacier Freeze flavors from Walmart in Islandia, New York, and the Target in Sayville, New York, for approximately $3.50 per bottle.

20. Prior to and at the time of each purchase, Plaintiff Greenberg Ulberg saw and read the representations on the front label of the Products she purchased, including the "HYDRATES BETTER THAN WATER" claim and the "No Artificial" Representations, and she relied on those Hydration and "No Artificial" Representations in deciding to purchase the Products. Plaintiff Greenberg Ulberg understood the Representations to mean that the Products would hydrate her better than water and that no human-manufactured substance imparts flavor to the Products.

21. Those Hydration and "No Artificial" Representations were false. The Products Plaintiff Greenberg Ulberg purchased are flavored with manufactured citric acid and sodium citrate, and do not hydrate better than water for the ordinary consumer. At the time of purchase, Plaintiff Greenberg Ulberg did not notice any disclaimer, qualifier, or other explanatory statement on the Products' labeling, packaging, or advertising that contradicted her understanding of the representations, and she had no reason to believe the representations were false.

22. The Products are sold at a price premium attributable to the challenged representations. Plaintiff Greenberg Ulberg paid that premium. Had she known the truth, she would not have purchased the Products, or would have paid significantly less for them.

23. Plaintiff Greenberg Ulberg continues to desire to purchase sports hydration drinks, including the Products, and would purchase the Products in the future if Defendants' labeling were truthful, but absent injunctive relief she cannot rely on Defendants' labeling and advertising in making future purchases.

24. ***Plaintiff Francesca Mignosi*** is a citizen of California, residing in Simi Valley, California, at all relevant times. During the Class Period, Plaintiff Mignosi purchased the Products for personal, family, or household use, and not for resale. Among other purchases, in or around January 2026, Plaintiff Mignosi purchased Lower Sugar Gatorade in Fruit Punch and the regular Gatorade in Glacier Frost Thirst Quencher—a Classic Gatorade—flavor from Walmart, Albertsons, and other retailers in California, for approximately $7.99 for a pack of 12 bottles, and made similar purchases on multiple occasions.

25. Prior to and at the time of each purchase, Plaintiff Mignosi saw and read the representations on the front label of the Products she purchased, including the "HYDRATES BETTER THAN WATER" claim and the "No Artificial" Representations, and she relied on those Hydration and "No Artificial" Representations in deciding to purchase the Products. Plaintiff Mignosi understood the Representations to mean that the Products would hydrate her better than water and that no human-manufactured substance imparts flavor to the Products.

26. Those Hydration and "No Artificial" Representations were false. The Products Plaintiff Mignosi purchased are flavored with manufactured citric acid and sodium citrate, and do not hydrate better than water for the ordinary consumer. At the time of purchase, Plaintiff Mignosi

did not notice any disclaimer, qualifier, or other explanatory statement on the Products' labeling, packaging, or advertising that contradicted her understanding of the Hydration and "No Artificial" Representations, and she had no reason to believe the Representations were false.

27. The Products are sold at a price premium attributable to the challenged representations. Plaintiff Mignosi paid that premium. Had she known the truth, she would not have purchased the Products, or would have paid significantly less for them.

28. Plaintiff Mignosi continues to desire to purchase sports hydration drinks, including the Products, and would purchase the Products in the future if Defendants' labeling were truthful, but absent injunctive relief she cannot rely on Defendants' labeling and advertising in making future purchases.

29. ***Plaintiff Alex Kononenko*** is a citizen of California, residing in San Mateo, California, at all relevant times.

30. During the relevant Class Period, Plaintiff Kononenko purchased various flavors of the Products during the Class Period for personal, family, or household use, and not for resale, most recently purchasing Gatorade Lower Sugar Glacier Cherry Electrolyte Sports Drink, bearing the "NO ARTIFICIAL FLAVORS, SWEETENERS, OR ADDED COLORS" and "HYDRATES BETTER THAN WATER" representations, from a Safeway location in Santa Clara, California, in or around May 2026, for approximately $3.

31. Prior to and at the time of each purchase, Plaintiff Kononenko saw and read the "No Artificial" Representations and "HYDRATES BETTER THAN WATER" claim printed on the front label of the Products, and he relied on those Representations in deciding to purchase the Products. Plaintiff Kononenko understood the Representations to mean that the Products would

hydrate him better than water and that no human-manufactured substance imparts flavor to the Products.

32. Those Hydration and "No Artificial" Representations were false. The Products Plaintiff Kononenko purchased are flavored with manufactured citric acid and sodium citrate, and do not hydrate better than water for the ordinary consumer. At the time of purchase, Plaintiff Kononenko did not notice any disclaimer, qualifier, or other explanatory statement on the Products' labeling, packaging, or advertising that contradicted his understanding of the Hydration and "No Artificial" Representations, and he had no reason to believe the Representations were false.

33. The Products are sold at a price premium attributable to the challenged Representations. Plaintiff Kononenko paid that premium. Had he known the truth, he would not have purchased the Products, or would have paid substantially less for them.

34. Plaintiff Kononenko continues to desire to purchase sports hydration drinks, including the Products, and would purchase the Products in the future if Defendants' labeling were truthful, but absent injunctive relief he cannot rely on Defendants' labeling and advertising in making future purchases.

35. ***Plaintiff Caitlin Darr*** is a citizen of California, residing in Huntington Beach, California, at all relevant times.

36. During the Class Period, Plaintiff Darr purchased the Products for personal, family, or household use, and not for resale. Among other purchases, in or around May 2026, Plaintiff Darr purchased Lower Sugar Gatorade in the Glacier Cherry flavor from Albertsons in Huntington Beach, California, for approximately $2.99. Plaintiff Darr has also purchased Gatorade Zero in the Glacier Freeze flavor on multiple occasions.

37. Prior to and at the time of each purchase, Plaintiff Darr saw and read the representations on the front label of the Products she purchased, including the "HYDRATES BETTER THAN WATER" claim and the No Artificial Flavors Representations, and she relied on those representations in deciding to purchase the Products. Plaintiff Darr understood the Representations to mean that the Products would hydrate her better than water and that no human-manufactured substance imparts flavor to the Products.

38. Those Hydration and "No Artificial" Representations were false. The Products Plaintiff Darr purchased are flavored with manufactured citric acid and sodium citrate, and do not hydrate better than water for the ordinary consumer. At the time of purchase, Plaintiff Darr did not notice any disclaimer, qualifier, or other explanatory statement on the Products' labeling, packaging, or advertising that contradicted her understanding of the Hydration and "No Artificial" Representations, and she had no reason to believe the Representations were false.

39. The Products are sold at a price premium attributable to the challenged representations. Plaintiff Darr paid that premium. Had she known the truth, she would not have purchased the Products, or would have paid significantly less for them.

40. Plaintiff Darr continues to desire to purchase sports hydration drinks, including the Products, and would purchase the Products in the future if Defendants' labeling were truthful, but absent injunctive relief she cannot rely on Defendants' labeling and advertising in making future purchases.

41. ***Plaintiff Michael Walsh*** is a citizen of California, residing in Whittier, California, at all relevant times.

42. During the Class Period, Plaintiff Walsh purchased the Products for personal, family, or household use, and not for resale. Among other purchases, in or around June 2026,

Plaintiff Walsh purchased the Regular and Zero Sugar Gatorade in the Fruit Punch flavor from Target in Pico Rivera, California, for approximately $1.69, and made similar purchases on multiple occasions in 2026.

43. Prior to and at the time of each purchase, Plaintiff Walsh saw and read the representations on the front label of the Products he purchased, including the "HYDRATES BETTER THAN WATER" claim, and he relied on that Hydration Representation in deciding to purchase the Products. Plaintiff Walsh understood the Hydration Representation to mean that the Products would hydrate him better than water.

44. That Representation was false. The Products do not hydrate better than water for the ordinary consumer. At the time of purchase, Plaintiff Walsh did not notice any disclaimer, qualifier, or other explanatory statement on the Products' labeling, packaging, or advertising that contradicted her understanding of the representations, and he had no reason to believe the representations were false.

45. The Products are sold at a price premium attributable to the challenged representation. Plaintiff Walsh paid that premium. Had he known the truth, he would not have purchased the Products, or would have paid significantly less for them.

46. Plaintiff Walsh provided Defendants with notice of his claims on June 22, 2026.

47. Plaintiff Walsh continues to desire to purchase sports hydration drinks, including the Products, and would purchase the Products in the future if Defendants' labeling were truthful, but absent injunctive relief he cannot rely on Defendants' labeling and advertising in making future purchases.

48. ***Plaintiff Philip Smith*** is a Citizen of California, residing in Los Angeles, California, at all times.

49. During the Class Period, Plaintiff Smith purchased the Products for personal, family, or household use, and not for resale. Among other purchases, in or around June 2026, Plaintiff Smith purchased Regular Gatorade in the Lemon Lime flavor from a 7/11 convenience store in Los Angeles, California, for approximately $3, and made similar purchases on multiple occasions in 2026.

50. Prior to and at the time of the purchase, Plaintiff Smith saw and read the representations on the front label of the Products he purchased, including the "HYDRATES BETTER THAN WATER" claim, and he relied on that Hydration Representation in deciding to purchase the Products. Plaintiff Smith understood the Hydration Representation to mean that the Products would hydrate better than water.

51. That Representations was false. The Products Plaintiff Smith purchased do not hydrate better than water for the ordinary consumer. At the time of the purchase, Plaintiff Smith did not notice any disclaimer qualifier, or other explanatory statement on the Products' labeling, packaging, or advertising that contradicted his understanding of the representations, and he had no reason to believe the representations were false.

52. The Products are sold at a price premium attributable to the challenged representations. Plaintiff Smith paid that premium. Had he known the truth, he would not have purchased the Products, or would have paid significantly less for them.

53. Plaintiff Smith continues to desire to purchase sports hydration drinks, including the Products, and would purchase the Products in the future if Defendants' labeling were truthful, but absent injunctive relief he cannot rely on Defendants' labeling and advertising in making future purchases.

54. ***Plaintiff John Leam*** is a citizen of Illinois, residing in Gilberts, Illinois, at all relevant times.

55. During the Class Period, Plaintiff Leam purchased the Products for personal, family, or household use, and not for resale. Among other purchases, and most recently in or around August 2026, Plaintiff Leam purchased Gatorade Zero Sugar in a variety of flavors from several different grocery retailers in Illinois.

56. Prior to and at the time of each purchase, Plaintiff Leam saw and read the representations on the front label of the Products he purchased, including the "HYDRATES BETTER THAN WATER" claim, and he relied on such representations in deciding to purchase the Products. Plaintiff Leam understood the representations to mean that the Products would hydrate him better than water.

57. That Hydration Representation was false. The Products Plaintiff Leam purchased do not hydrate better than water for the ordinary consumer. At the time of purchase, Plaintiff Leam did not notice any disclaimer, qualifier, or other explanatory statement on the Products' labeling, packaging, or advertising that contradicted his understanding of the representations, and he had no reason to believe the representations were false.

58. The Products are sold at a price premium attributable to the challenged representations. Plaintiff Leam paid that premium. Had he known the truth, he would not have purchased the Products, or would have paid significantly less for them.

59. Plaintiff Leam continues to desire to purchase sports hydration drinks, including the Products, and would purchase the Products in the future if Defendants' labeling were truthful, but absent injunctive relief he cannot rely on Defendants' labeling and advertising in making future purchases.

60. ***Plaintiff Shannon Mahoney*** is a citizen of Pennsylvania, residing in Philadelphia, Pennsylvania, at all relevant times.

61. During the Class Period, Plaintiff Mahoney purchased the Products for personal, family, or household use, and not for resale. Among other purchases, in or around March 2026, Plaintiff Mahoney purchased Lower Sugar Gatorade in the Glacier Cherry and Rain Berry flavors from Walmart, for approximately $4.36 respectively. Plaintiff Mahoney made similar purchases on multiple occasions in 2026.

62. Prior to and at the time of each purchase, Plaintiff Mahoney saw and read the representations on the front label of the Products he purchased, including the "HYDRATES BETTER THAN WATER" claim and the "No Artificial" Representations, and he relied on those representations in deciding to purchase the Products. Plaintiff Mahoney understood the representations to mean that the Products would hydrate him better than water and that no human-manufactured substance imparts flavor to the Products.

63. Those Hydration and "No Artificial" Representations were false. The Products Plaintiff Mahoney purchased are flavored with manufactured citric acid and sodium citrate, and do not hydrate better than water for the ordinary consumer. At the time of purchase, Plaintiff Mahoney did not notice any disclaimer, qualifier, or other explanatory statement on the Products' labeling, packaging, or advertising that contradicted his understanding of the Hydration and "No Artificial" Representations, and he had no reason to believe the Representations were false.

64. The Products are sold at a price premium attributable to the challenged representations. Plaintiff Mahoney paid that premium. Had he known the truth, he would not have purchased the Products or would have paid significantly less for them.

65. Plaintiff Mahoney continues to desire to purchase sports hydration drinks, including the Products, and would purchase the Products in the future if Defendants' labeling were truthful, but absent injunctive relief he cannot rely on Defendants' labeling and advertising in making future purchases.

## II. Defendants

66. Defendant PepsiCo, Inc. is a North Carolina corporation with its principal place of business at 700 Anderson Hill Road, Purchase, New York 10577, in the Town of Harrison, Westchester County, within this District. PepsiCo is one of the largest food and beverage companies in the world. Its products are enjoyed by consumers more than one billion times a day in more than 200 countries and territories, generating nearly $92 billion in net revenue in 2024, driven by a complementary beverage and convenient foods portfolio. PepsiCo owns Defendants The Gatorade Company and Stokely-Van Camp, Inc. Directly and through those subsidiaries, PepsiCo formulates, manufactures, markets, advertises, distributes, and sells the Products throughout the United States, both online and at retail, and directs, controls, approves, and participates in the labeling, marketing, and advertising of the Products, including the challenged representations.

67. Defendant The Gatorade Company is an Illinois corporation with its principal place of business located at 555 W. Monroe St., Chicago, Illinois 60661. Gatorade Co. is a subsidiary of PepsiCo. Gatorade Co. markets, manufactures, distributes, and sells the Products, and is responsible for the placement of the Products for sale both online and at retail.

68. Defendant Stokely-Van Camp, Inc. is an Indiana corporation with a principal place of business at 433 W. Van Buren Street, Suite 3N, Chicago, Illinois 60607. It is a subsidiary of PepsiCo and is the registered owner of the GATORADE and G-design trademarks under which

the Products are sold. At all relevant times, Defendants formulated, manufactured, marketed, advertised, labeled, distributed, and sold the Products throughout the United States, and each Defendant participated in, authorized, approved, ratified, or is otherwise responsible for the representations challenged in this Complaint. Defendants had exclusive control over the content of the Products' labels and advertising.

**THE PRODUCTS**

69. This Action concerns the following Gatorade-branded beverages and beverage powders:

a. Lower Sugar Gatorade, in all flavors bearing the Hydration and the "No Artificial" Representations;

b. Gatorade Powder, in all flavors bearing the Hydration and the "No Artificial" Representations;

c. Classic Gatorade, in all flavors bearing the Hydration Representation; and

d. Gatorade Zero, in all flavors bearing the Hydration Representation.

70. Two distinct sets of misrepresentations are at issue, and Plaintiffs plead them separately:

a. The "No Artificial" Representations — the claims that the Products contain "no artificial flavors, sweeteners, or added colors," "no artificial flavors, sweeteners, or colors from artificial sources," "no added colors or artificial flavors," "no artificial sweeteners or flavors," that the Products are "Naturally Flavored," and that the Products are "Naturally Flavored with Other Natural Flavors." These representations appear on the Lower Sugar Gatorade and Gatorade Powder—the "No Artificial" Products—identified in Section II below.

b. The Hydration Representation — the claim "HYDRATES BETTER THAN WATER," which appears on all the Products, as identified in Section III below.

71. The Products are substantially similar to one another in every respect material to this Action. Each is manufactured, marketed, labeled, and sold by Defendants under the Gatorade brand. Each is marketed directly to consumers for personal consumption. Each bears one or both

challenged misrepresentations prominently on the front of the package, in the location and typeface reserved for a package's most persuasive information. And the deceptive effect of the misrepresentations is identical across the Products: consumers are induced to buy, or to overpay for, a product that lacks the advertised attribute.

## FACTUAL ALLEGATIONS

### I. Gatorade and the Sports Hydration Drink Industry

72. The sports hydration drink industry is a multi-billion-dollar industry which has a presence across the United States and the world. Generally, sports hydration drinks are designed to replace lost water, provide electrolytes, and replenish lost carbohydrates caused by heavy sweating from intense activity.

73. Gatorade is the monolith within the industry.

74. Gatorade was founded in 1965 at the University of Florida for its football team, the Florida Gators. The goal of the creation of the drink was to provide replacement of lost bodily fluid during extreme physical exercise. The drink found instant success, with Florida Gators crediting their first Orange Bowl victory in 1967 due to the hydration it provided in extreme heat. After the 1967 Orange Bowl, the coach of the Gators' opponent stated, "[w]e didn't have Gatorade. That made the difference."[10]

75. The Quaker Oats Company purchased Gatorade in 1983 for $220 million.[11]

---

[10] *About Our History*, Cade Museum, *available at* https://cademuseum.org/about/history/.

[11] Jeff Schweers, *History of Gatorade: a simple question, a profound impact,* THE GAINSVILLE SUN (Oct. 4, 2015), https://www.gainesville.com/story/sports/college/2015/10/04/history-of-gatorade-a-simple-question-a-profound-impact/31114761007/

76. In 2001, PepsiCo acquired the Quaker Oats Company, including Gatorade, for $13 billion.[12]

77. In 2025, Gatorade's annual sales surpassed $7.5 billion in the United States market.[13]

78. Gatorade's market share in the sports hydration drink market is over 60%. [14]

## II. THE NO ARTIFICIAL MISREPRESENTATIONS

### A. Defendants Prominently Represent That the "No Artificial" Products Contain No Artificial Flavors

79. Reasonable consumers understand the phrase "artificial flavor" in its ordinary, everyday sense. "Artificial" means made by humans and made to seem like something natural.[15]

80. A "flavor" is something that affects the sense of taste. A consumer reading "no artificial flavors" on the front of a bottle understands Defendants to be promising that nothing human-manufactured is making the drink taste the way it tastes.

---

[12] *Id*.

[13] *Id*.

[14] *Gatorade revamps brand to compete in booming hydration market*, NBC PALM SPRINGS (Apr. 16, 2026), https://www.nbcpalmsprings.com/business-finance-and-tech/2026/04/16/gatorade-revamps-brand-to-compete-in-booming-hydration-market

[15] Merriam-Webster, *Artificial* (defined as "made, produced, or done by humans especially to seem like something natural"), https://www.merriam-webster.com/dictionary/artificial

81. In March 2026, Defendants announced the launch of Lower Sugar Gatorade and, with it, "a new era of hydration with no artificial flavors, sweeteners or colors," targeted at "active consumers." The claim was placed at the center of the Lower Sugar Gatorade's front label, inside a colored chevron, in the large and bold typeface:




*Gatorade Lower Sugar Electrolyte Sports Drink (Glacier Cherry, 28 fl. oz.)*
*("NO ARTIFICIAL FLAVORS, SWEETNERS, OR ADDED COLORS").*

82. Immediately beneath the "NO ARTIFICIAL" chevron, Defendants add a second representation: "NATURALLY FLAVORED WITH OTHER NATURAL FLAVORS." On the Fruit Punch flavor, the claim is stated without qualification: "NATURALLY FLAVORED."

83. The same representations appear on Gatorade Zero, which states in bold, capitalized text: "NO ADDED COLORS OR ARTIFICIAL FLAVORS":




*Gatorade Zero Thirst Quencher Powder*
*("NO ADDED COLORS OR ARTIFICIAL FLAVORS").*

**B. Defendants Repeat the "No Artificial" Representations Across Every Channel Through Which They Sell**

84. The "No Artificial" Representations are not confined to the package. Defendants have built an integrated, multi-channel marketing campaign around them, ensuring that every consumer encounters the "No Artificial" Representations, whether it is in a store, in an advertisement, or on a retailer's website.

85. On Gatorade.com, Defendants list Lower Sugar Gatorade beneath the header "Gatorade Lower Sugar" and the subtitle "No artificial flavors, sweeteners, or colors." Under "Product Details," Defendants state that the "No Artificial" Products contain "no artificial flavors, sweeteners or colors from artificial sources."




*Defendants' website and product advertising for Lower Sugar Gatorade (annotations added).*

86. Defendants also promote the claim through video advertising on YouTube, under the title "Introducing Gatorade Lower Sugar: No Artificial Flavors, Sweeteners, or Colors," in which the phrase "NO ARTIFICIAL FLAVORS" is superimposed across the full frame:




*Defendants' YouTube advertising and Gatorade.com product page (annotations added).*

87. Defendants' marketing executives have described the campaign in their own words. Anuj Bhasin, Gatorade's Senior Vice President of Marketing, stated that the campaign "celebrates the inner 'IT' that keeps them moving, alongside a hydration solution with the flavors they know and love, but with no artificial flavors, sweeteners or colors and 75% less sugar than original Gatorade." Defendants thus expressly linked the "No Artificial" Products' flavor to the promise that the flavor is not artificial.

88. Defendants reiterate the No Artificial Representations on their social media accounts, including Instagram and Facebook. On March 4, 2026, Defendants' verified Gatorade Facebook account posted, together with professional athletes Candace Parker and Caitlin Clark,

an advertisement captioned “Introducing Gatorade Lower Sugar. No artificial flavors, sweeteners, or colors,” featuring the phrase “NO ARTIFICIAL FLAVORS” in oversized type above three bottles of the “No Artificial” Product.




*Defendants' Facebook advertisement for the Lower Sugar Gatorade.*[16]

89. On April 16, Gatorade's verified Instagram account posted an advertisement captioned: “We'd rather show than tell you [] Introducing Gatorade Lower Sugar. No artificial

[16] https://www.facebook.com/watch/?v=1417743619800984.

flavors, sweeteners or colors," accompanied by images of Gatorade Lower Sugar and oversized, bold, capitalized text reading: "NO ARTIFICIAL FLAVORS, SWEETENERS, OR COLORS[.]"




*Defendants' Instagram advertisement for Lower Sugar Gatorade.*[17]

17 https://www.instagram.com/p/DXNCKxwCVlb/?img_index=1&stkn=MzRlODBiNWFlZA==

90. Defendants further disseminate the claims through paid partners. Defendants' Instagram account posted promotional videos advertising Lower Sugar Gatorade with influencer Claire Kittle and professional golfer Roland Pollard, in which Defendants' paid partners repeat both the "No Artificial" and Hydration Representations.




*Screenshots of the paid Kittle and Pollard promotional posts for the Products on Instagram.*[18]

[18] *See* https://www.instagram.com/reel/DWm-CnejtB_/ (Kittle); https://www.instagram.com/reel/DXKIlYEDJcx/ (Pollard).

91. Defendants carry the "No Artificial" Representations onto every major retail platform on which the "No Artificial" Products are sold. On Target's website, Lower Sugar Gatorade is titled "Gatorade Lower Sugar No Artificial Glacier Cherry." On Walmart's website, it is titled "Gatorade Lower Sugar, No Artificials Glacier Cherry Flavored Electrolyte Sports Drink." The claim is thus embedded in the product name itself — the first thing a consumer sees and the text by which Lower Sugar Gatorade is searched, listed, and sold.







*Walmart product pages for Lower Sugar Gatorade (annotations added).*[19]

92. On Amazon, Defendants state under "Special Ingredients": "No Artificial Flavors, Sweeteners, or Colors from Artificial Sources." Defendants further claim that "Gatorade Lower

[19] https://www.walmart.com/ip/Gatorade-Lower-Sugar-Glacier-Cherry-12oz-12pk-PET/18894012097.

Sugar delivers bold colors that Gatorade is known for without using artificial color sources," and that Lower Sugar Gatorade "contains no artificial flavors, sweeteners or colors."

93. The uniformity is the point. Whether a consumer encounters the "No Artificial" Products on a shelf, in a feed, or in a search result, the consumer receives the same representation, in the same words, from the same source: Defendants.

**C. The Citric Acid in the Products Is Manufactured, Not Naturally Derived**

94. Citric acid occurs naturally in citrus fruit. The citric acid in the "No Artificial" Products does not come from citrus fruit, however. It is manufactured, on an industrial scale, from a strain of black mold.

95. Manufactured citric acid is, in the words of the peer-reviewed literature, a "ubiquitous substance and one of the most common food additives in the world. Approximately 99% of the world production of citric acid is made through microbial processes using predominantly a mutant strain of the black mold *Aspergillus niger*."[20]

96. The history is well documented. As surgeons at the University of Illinois recount, "[i]n 1917, American food chemist James Currie had begun experimenting with a process of making citric acid from mold. Currie discovered that strains of *Aspergillus niger* provided high yields of citric acid through a fermentation process using low cost molasses as the raw material. This system was very cost effective and rapidly adopted. Pfizer started to produce citric acid from Aspergillus niger in 1919, and this method is still used today across the world."[21]

---

[20] Iliana E. Sweis & Brian C. Cressey, *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports* ("Sweis Report"), 5 TOXICOLOGY REPORTS 808 (2018), https://pubmed.ncbi.nlm.nih.gov/30128297/.

[21] *Id*. at 808–09.

97. In 1995, the USDA reported that citric acid obtained "[t]raditionally, by extraction from citrus juice [is] no longer commercially available. It is now extracted by fermentation of a carbohydrate substance (often molasses) and by a citric acid bacteria, Aspergillus niger (black mold) or Candida guilliermondii (yeast). Citric acid is recovered from the fermentation broth by a lime and sulfuric acid process in which the citric acid is first precipitated as a calcium salt and then reacidulated with sulfuric acid."[22] In 2015, the USDA reiterated that "[c]itric acid purified from citrus fruits is technically feasible, but whether it is economically possible is unknown," and stated that industrial fermentation using *Aspergillus niger* "exclusively" accounts for citric acid production.[23] The scientific literature agrees: "Citric acid is exclusively produced by fermentation with the filamentous fungus *Aspergillus niger*."[24]

98. "Among the potential microbes" for creation of manufactured citric acid, manufacturers prefer *Aspergillus niger* "because it produces black-colored molds known as citric

[22] *Citric Acid Technical Report*, at 4, USDA AGRIC. MKTG. SERV. (1995), https://www.ams.usda.gov/sites/default/ files/media/Citric%20Acid%20TR%201995.pdf (alteration in original) (hereinafter "*Citric Acid Tech. Rep. 1995.*").

[23] *Citric Acid Technical Report*, at 10, 25, USDA AGRIC. MKTG. SERV. (2015), https://www.ams.usda.gov/sites/default/ files/media/Citric%20Acid%20TR%202015.pdf (alteration in original) (hereinafter "*Citric Acid Tech. Rep. 2015.*")

[24] K. Kirimura, Y. Honda & T. Hattori, *Citric acid*, 3 COMPREHENSICE BIOTECHNOLOGY 135 (2011), https://waseda.elsevierpure.com/en/publications/citric-acid-2/; *see also* Walid A. Lofty et al., *Citric acid production by a novel Aspergillus niger isolate: II. Optimization of process parameters through statistical experimental designs*, 98 BIORESOURCE TECH. 3470 (2007), https://www.sciencedirect.com/science/article/abs/pii/S0960852406005943 (demand "can only be satisfied by biotechnological fermentation processes"); R. Ciriminna et al., *Citric acid: emerging applications of key biotechnology industrial product*, 11 CHEMISTRY CENT. J. 22 (2017), https://pubmed.ncbi.nlm.nih.gov/28326128/; A. Hesham, Y. Mostafa & L. Al-Sharqi, *Optimization of citric acid production by immobilized cells of novel yeast isolates*, 48 MYCOBIOLOGY 122 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7178817/.

acid-producing cell factories[.]"[25] "*Aspergillus niger* is more popular among all other microorganisms for bulk production of citric acid because of possessing the ability to use a wide range of raw materials"--in other words, because *Aspergillus niger* can derive manufactured citric acid from a wide range of bizarre and unexpected inputs.[26]

99. To manufacture citric acid, sugars are fermented using the mutant mold *Aspergillus niger*, which biosynthesizes citric acid through microbial metabolism under tightly controlled industrial conditions.[27] This artificial citric acid is not extracted from citrus fruit or any other naturally occurring source, but is created during industrial fermentation as a metabolic product of the microorganism.

100. Industrial fermentation using *Aspergillus niger* is carried out through two production methods: surface and submerged processes, which "exclusively" account for citric acid production.[28]

101. In the surface process for creating artificial citric acid, sterile sugar-containing media (i.e., a nutrient mixture of sugars dissolved in water) are placed in controlled chambers and inoculated with *Aspergillus niger*, where temperature, humidity, airflow, and pH are continuously regulated. The organism forms a mycelial layer (a dense mat of fungal growth) across the surface

---

[25] Ambreen Latif, *et al*, *An overview of key industrial product citric acid production by Aspergillus niger and its application,* Journal of Industrial Microbiology and Biotechnology, Volume 52, 2025 (Mar. 28, 2025), *available at* https://academic.oup.com/jimb/article/doi/10.1093/jimb/kuaf007/8099947.

[26] *Id.*

[27] A.R. Angumeenal & D. Venkappayya, *An overview of citric acid production*, 50 LWT - FOOD SCIENCE AND TECHNOLOGY 367 (2013), https://www.sciencedirect.com/science/article/pii/S0023643812002332.

[28] *Citric Acid Tech. Rep. 2015, supra,* 10-11.

and converts sugars into artificial citric acid over several days.[29] This process requires sterilization, environmental control, and continuous monitoring and adjustment of reaction conditions to drive production.

102. In the submerged (or deep fermentation) process for creating artificial citric acid, the product is produced in large, aerated fermentors (industrial tanks) containing liquid broth. Inputs are sterilized and chemically adjusted, including the controlled addition and balancing of micronutrients and metals to optimize yield.[30] The system operates under carefully regulated temperature, aeration, and, at times, elevated pressure to increase oxygen transfer. Production depends on maintaining precise control over the chemical environment throughout fermentation. Submerged fermentation is the predominant commercial method used to produce artificial citric acid.[31] *Aspergillus niger* is used by manufacturers in this process because it "demonstrates capacity to produce a maximum of 90 g/l of citric acid through submerged fermentation when utilizing sucrose as a substrate[.]"[32]

103. Artificial citric acid—through surface or submerged fermentation—is generated through a tightly controlled industrial process involving sterilization, chemical manipulation of inputs, and engineered reaction conditions. Meaning, it is manufactured and not naturally derived.

---

[29] *Id.*

[30] *Id.*

[31] Belén Max, *et al. Biotechnological production of citric acid*, 41 BRAZILIAN JOURNAL OF MICROBIOLOGY 862 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3769771/

[32] Latif, *An overview of key industrial product citric acid production by Aspergillus niger and its application.*

104. Further, "[a]t the end of fermentation, the medium contains citric acid and various undesirable by-products such as mycelium, other organic acids, mineral salts, proteins, etc."[33] The product therefore must undergo further industrial processing known as "recovery and purification."[34] The recovery and purification of artificial citric acid refers to the set of industrial steps used after fermentation in an attempt to separate, purify, isolate, and ultimately extract the artificial citric acid from the fermentation mixture so that it can be used as a commercial food ingredient.

105. The extraction is accomplished with synthetic chemical solvents. The FDA's own regulation governing the "[s]olvent extraction process for citric acid" provides that "recovery of citric acid from conventional *Aspergillus niger* fermentation liquor may be safely used to produce food-grade citric acid" where "[t]he solvent used in the process consists of a mixture of n-octyl alcohol . . . synthetic isoparaffinic petroleum hydrocarbons . . . and tridodecyl amine." 21 C.F.R. § 173.280 (emphasis added). The citric acid Defendants use in the Products is produced through this chemical solvent extraction process.

106. The end product of that process is not fruit or fruit extract. It is, per the USDA, "a clear to white crystalline solid. It is odorless and has a strong acidic (sour) taste."[35] None of the available manufacturing methods for citric acid — surface or submerged processes, or otherwise — result in anything a reasonable consumer would call natural flavoring. Each is an industrial chemical process that converts fermented mold broth into an odorless, acidic crystalline powder.

---

[33] *Citric Acid Tech. Rep. 2015, supra*, 12.

[34] *How Citric Acid is Produced: The Process Behind This Common Food Additive?*, ELCHEMY (Dec. 24, 2024), https://elchemy.com/blogs/food-nutrition/how-citric-acid-is-produced-the-process-behind-this-common-food-additive.

[35] *Citric Acid Tech. Rep. 2015, supra*, 3.

107. The USDA has said as much. In its 1995 technical review, the USDA categorized citric acid as "synthetic" rather than "natural," and its reviewer explained why: citric acid "is a natural occurring substance that commercially goes through numerous chemical processes to get to it's [sic] final usable form. This processing would suggest that it be classified as synthetic."[36]

108. Although the molecular formula of citric acid derived from lemons and the molecular formula of manufactured citric acid are the same, they are not the same substance. As the peer-reviewed literature explains, "the potential presence of impurities or fragments from the *Aspergillus niger* in [manufactured citric acid] is a significant difference."[37] Therefore, upon information and belief, artificial citric acid contains impurities that natural citric acid does not, providing further evidence that artificial citric acid is unnatural.

109. What Defendants put in the "No Artificial" Products is the artificial and synthetic industrial citric acid product, not the made-in-nature fruit-derived one. Given the volume of "No Artificial" Products that Defendants manufacture and sell — Gatorade holds approximately 60% of the U.S. sports drink market, with sales exceeding $7.5 billion, and Lower Sugar Gatorade ranks among the best-selling sports drinks on Amazon — and given that approximately 99% of all commercially available citric acid is manufactured citric acid derived from Aspergillus niger, it is not plausible that the citric acid in the "No Artificial" Products is naturally derived. Upon information and belief, the citric acid in the "No Artificial" Products is manufactured citric acid.

**D. The Sodium Citrate in the Products Is a Manufactured Flavoring**

110. The "No Artificial" Products also contain sodium citrate, which is both artificial and a flavoring.

---

[36] *Citric Acid Tech. Rep. 1995, supra*, 3.

[37] Sweis Report, at 809.

111. Sodium citrate is a synthetic byproduct of manufactured citric acid, "produced by chemical reaction with citric acid and the hydroxide or carbonate," and is likewise a "clear to white crystalline solid[] with an acidic (sour) taste, with some having a slightly salty taste."[38] It is expressly categorized under federal regulation as a synthetic substance. 7 C.F.R. § 205.605(b) (listing sodium citrate among "[s]ynthetics allowed" as nonagricultural substances in or on processed products labeled as "organic").

112. Sodium citrate is in the "No Artificial" Products for the same reason citric acid is. As the USDA explains, "[s]odium citrate is chiefly used as a food additive, usually for flavoring." The USDA offers a directly analogous example: "Sodium citrate gives club soda both its sour and salty flavors. It is common in lemon-lime soft drinks, and it is partly what causes them to have their sour taste."[39]

113. Sodium citrate is among the top five ingredients in all of the Products. It is the fourth ingredient in Lower Sugar Gatorade and the third in Gatorade Powder. If sodium citrate were removed or substantially reduced, the result is a material alteration to the taste of the Products.

114. Accordingly, the "No Artificial" Products are flavored with two manufactured, synthetic flavoring ingredients — citric acid and sodium citrate — each of which appears on the label ahead of "natural flavor," and each of which independently renders the "No Artificial" Representations false.

---

[38] *Citric Acid Tech. Rep. 2015, supra,* 3.

[39] *Id.*, at 21.

### E. The Manufactured Citric Acid and Sodium Citrate in the Products Are Flavorings

115. Citric acid is in the "No Artificial" Products because of the impact it has on taste. The USDA identifies the "[m]ajor attractions of citric acid as a food and beverage acidulant" as its "high solubility, extremely low toxicity, and pleasant sour taste."[40] The USDA separately identifies flavoring as a recognized functional use of citric acid, including in "food products and artificial flavors" for "soft drink tablets and powders."[41] The FDA's own inventory of substances added to food identifies flavoring among citric acid's recognized technical effects.[42]

116. In the food and beverage industry, "citric acid [] provides a fruity flavor," and is otherwise used to "add sour flavor[.]"[43] "Citric acid can only be detected via sour taste,"[44] and scientific literature demonstrates that citric acid actively shapes overall flavor perception by interacting with sugars to balance sweetness and sourness.[45]

---

[40] *Id.*, at 20.

[41] *Id.*, at 20-21.

[42] FDA, *Substances Added to Food*, CITRIC ACID (77-92-9) (updated Jul. 28, 2026), https://www.hfpappexternal.fda.gov/scripts/fdcc/index.cfm?set=FoodSubstances&id=CITRICACID.

[43] Tong, *et al.*, *Whole Maize Flour and Isolated Maize Starch for Production of Citric Acid by Aspergillus Niger: A Review*, 75 STARCH – STÄRKE 1 (2023), https://onlinelibrary.wiley.com/doi/abs/10.1002/star.202000014.

[44] Hannah E R Frank, *The evolution of sour taste, Proceedings*. 289 BIOLOGICAL SCIENCES 3 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8826303/.

[45] *See, e.g.,* Junge, *et al.*, *Suppression of sweetness: evidence for central mechanism for suppression of sweetness from sucrose by citric acid*, 48 CHEMICAL SENSES (2023), https://academic.oup.com/chemse/article/doi/10.1093/chemse/bjad036/7260297; Mao et al., *Dynamic interaction of sweet and sour taste perceptions based on sucrose and citric acid*, 9 SCIENCE OF FOOD (2025), https://www.nature.com/articles/s41538-025-00507-7; Veldhuizen et al., *Interactions of Lemon, Sucrose and Citric Acid in Enhancing Citrus, Sweet and Sour Flavors*, 43 CHEMICAL SENSES (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5863559/.

117. So too for sodium citrate. As the USDA explains: "Sodium citrate is chiefly used as a food additive, usually for flavoring or as a preservative."[46] For example, "Sodium citrate gives club soda both its sour and salty flavors. It is common in lemon-lime soft drinks, and it is partly what causes them to have their sour taste."[47]

118. The "No Artificial" Products' own ingredient lists confirm the point. Ingredients are listed in descending order of predominance by weight. Citric acid is the third ingredient in Lower Sugar Gatorade after only water and sugar.

Water, sugar, citric acid, sodium citrate, salt, natural flavor, monopotassium phosphate, purified stevia leaf extract, vegetable juice (color), modified food starch, glycerol ester of rosin.

*Lower Sugar Gatorade ingredient statement (citric acid third; sodium citrate fourth).*

119. In every Lower Sugar Gatorade, citric acid precedes "natural flavor" on the ingredient list — in most cases by several positions. Defendants add more manufactured citric acid to the Products than they add natural flavoring, and in some "No Artificial" Products, they add more citric acid than anything else at all.

[46] *Citric Acid Tech. Rep. 2015, supra,* 21.

[47] *Id.*

120. Indeed, on the Gatorade Powder label, citric acid and sodium citrate are listed as the *first* and third ingredients:




*Gatorade Powder ingredient statement (citric acid first; sodium citrate third).*

121. If the manufactured citric acid were removed from the "No Artificial" Products, or substantially reduced, the result is that the taste of the "No Artificial" Products would be materially altered. Manufactured citric acid supplies the tart, sour profile that is central to how the "No Artificial" Products taste. It therefore functions "to impart flavor" within the ordinary meaning of the term, and within the meaning a reasonable consumer would give to Defendants' "no artificial flavors" claim.

122. That conclusion does not depend on Defendants' subjective intent. Manufactured citric acid acts as a flavoring agent in the "No Artificial" Products regardless of any purpose Defendants may assert for having added it, because it inherently imparts acidity and thereby modifies the flavor profile of the finished beverage. It is, by its chemical nature and its recognized commercial use, a flavoring or acidulant additive. A manufacturer cannot escape a "no artificial flavors" promise by asserting that the artificial substance producing the taste was added for some other reason; the reasonable consumer's expectation is defined by what the substance is, not by the manufacturer's undisclosed rationale as to what it does.

### F. Federal Regulators and Federal Courts Have Repeatedly Recognized That Manufactured Citric Acid Defeats a "Natural" Claim

123. The FDA has considered the term "natural" to mean "that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in that food."[48] Applying that understanding, the FDA has repeatedly issued warning letters to food sellers whose products were labeled "natural" while containing manufactured citric acid:

a. In an August 16, 2001 warning letter to Oak Tree Farm Dairy, Inc., concerning "Oaktree Real Brewed Iced Tea," "Oaktree Fruit Punch," and "Oaktree All Natural Lemonade," the FDA advised that the "100% NATURAL" and "ALL NATURAL" representations were "inappropriate" because the product "contains citric acid."[49]

b. In an August 29, 2001 warning letter to Hirzel Canning Company, concerning its Chopped Tomatoes Onions & Garlic and Chopped Mexican Tomatoes & Jalapenos, the FDA advised that "the addition of . . . citric acid to these products preclude[s] the use of the term 'natural' to describe this product."[50]

124. Federal courts, including the Ninth Circuit, have found it plausible — and triable — that citric acid produced by *Aspergillus niger* fermentation is not natural and may constitute an artificial ingredient. In *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531 (9th Cir. 2016), the Ninth Circuit reversed summary judgment for the defendant, relying on the same FDA warning letters described above. The court explained that the plaintiff had cited "FDA warning letters to food sellers" whose products were described as "'100% Natural' or 'All Natural,'" and which "the FDA accused . . . of being deceptive because the products in question included synthetic citric acid, among other substances." *Id.* at 533. Taken together, the court held, that evidence "could allow a trier of fact to conclude that Dole's description of its products as 'All Natural Fruit' is

---

[48] *Use of the Term "Natural" on Food Labeling*, U.S. FOOD & DRUG ADMIN. (Mar. 2022), https://www.fda.gov/food/food-labeling-nutrition/use-term-natural-food-labeling.

[49] *Jones v. ConAgra Foods, Inc.*, 3:12-cv-01633-CRB (N.D. Cal.), ECF No. 95-2; 95-1.

[50] *Id.*

misleading to a reasonable consumer," and "could also allow a trier of fact to find that the synthetic citric and ascorbic acids in Dole's products were not 'natural.'" *Id.* at 533–34.

125. Defendants thus made the "No Artificial" Representations against the backdrop of two decades of federal warning letters, published USDA technical reports classifying citric acid as synthetic, peer-reviewed literature establishing that essentially all commercial citric acid is mold-derived, and appellate authority holding that a jury could find precisely what Plaintiffs allege here.

## III. THE HYDRATION MISREPRESENTATION

126. Plaintiffs' second theory is independent of the first. It concerns a different representation, appearing in a different location on the package, conveying a different message, which is false for different reasons. Plaintiffs plead it separately, in the alternative to, and in addition to, the "No Artificial" Representation described in Section II.

### A. Defendants Represent That the Products Hydrate Better Than Water

127. Across the shoulder of every bottle of Classic Gatorade, Gatorade Zero, and Lower Sugar Gatorade, and on the front of every carton of Gatorade Powder, Defendants print, in bold capital letters, an unqualified comparative claim: HYDRATES BETTER THAN WATER.




*Classic Gatorade, Gatorade Zero, Lower Sugar Gatorade, and Gatorade Zero Powder, each bearing the "HYDRATES BETTER THAN WATER" representation.*

128. The representation is not hedged, qualified, conditioned, or footnoted on the label. It does not say: "can hydrate better than water." It does not say: "hydrates better than water during exercise sessions longer than 60 minutes." It does not say: "hydrates better than water when you are sweating a lot." It says, to every objectively reasonable consumer who picks up the bottle, that the Products hydrate better than water.

129. Defendants repeat the claim throughout their marketing. On Amazon, Defendants state: "Gatorade Hydrates Better than Water: Ideal for lower intensity activity or when combined with another energy source." Defendants further claim the Products are "[s]cientifically-formulated with Gatorade's #1 proven electrolyte blend to hydrate better than water." Walmart's and Target's listings for the Products carry promotional images displaying the same claim.

### B. The Hydration Representation Is False for the Overwhelming Majority of Consumers

130. When a person sweats, the body loses water together with electrolytes, sodium, and carbohydrates. The more a person sweats, the more water, electrolytes, sodium, and carbohydrates the body loses. Whatever advantage Gatorade has over water is confined to that circumstance: Gatorade replaces the electrolytes, sodium, and carbohydrates that sweat removes. Absent sustained and/or excessive sweating, replacing electrolytes, sodium, and carbohydrates confers no hydration benefit, because they have not been lost.

131. For a consumer who is not sweating, the Products provide no additional hydration over water whatsoever and instead deliver unnecessary sugar and sodium.[51] A 28-ounce bottle of Classic Gatorade contains 48 grams of added sugar — approximately 69% of a person's recommended daily added sugar intake, and more than the American Heart Association's entire recommended daily limit of 36 grams for men and 25 grams for women. The same bottle contains 380 milligrams of sodium, roughly 17% of the daily recommended limit.[52] Lower Sugar Gatorade contains approximately 16% of a person's daily added sugar intake per bottle.

132. Medically reviewed sources are direct on the point: "many people use sports drinks like Gatorade for daily hydration, which is not what they are intended for. There isn't strong

---

[51] *See* Claire Paddock, Nick Ruggiero & Dan Smith, Gatorade: *Do "Average Joes" Need to Hydrate Like Professional Athletes?*, UNIVERSITY OF DELAWARE (Feb. 27, 2018), https://sites.udel.edu/coe-engex/2018/02/27/gatorade-do-average-joes-need-to-hydrate-like-professional-athletes/.

[52] Lindsey DeSoto, *Does Gatorade Effectively Hydrate You?*, HEALTH (Jan. 16, 2026), https://www.health.com/does-gatorade-hydrate-you-11754011.

research showing the benefits of sports drinks for low-intensity exercise lasting less than an hour . . . plain water is usually the best choice."[53]

133. The overwhelming majority of consumers who purchase the Products are not sustained-exertion athletes mid-session.[54] According to the CDC's physical activity guidelines, adults need approximately 150 minutes of moderate activity per week — roughly twenty-one minutes per day — which falls far short of the sustained exertion Defendants' own science says is required before the Products offer any hydration advantage at all.[55] For that ordinary consumer — the consumer at the gas station cooler, the desk, the sideline bench, the kitchen counter — the representation on the label is simply untrue.

## IV. MATERIALITY OF BOTH REPRESENTATIONS

134. The "No Artificial" and Hydration Representation are material to reasonable consumers, including Plaintiffs, in deciding whether to purchase the Products and how much to pay for them.

---

[53] *Id*.

[54] Consumers who would pay more for sports beverages offering benefits beyond sports performance are more likely to identify themselves as regular exercisers but non-athletes (37%) or less regular exercisers (38%) than as athletes (29%), SPORTS BEVERAGE MARKET FLEXES, FOOD TECHNOLOGY MAGAZINE (Feb. 2024), https://www.ift.org/food-technology-magazine/sports-beverage-market-flexes (reporting Mintel data), and 31.3% of American adults reported consuming a sports or energy drink within the prior seven days, Sohyun Park et al., *Characteristics Associated with Consumption of Sports and Energy Drinks Among US Adults: National Health Interview Survey*, 2010, 113 J. ACAD. NUTRITION & DIETETICS 112 (2013), https://pubmed.ncbi.nlm.nih.gov/23260728/.

[55] *Adult Activity: An Overview*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/physical-activity-basics/guidelines/adults.html (last visited May 20, 2026); *compare to How Gatorade Works & Why It Can Hydrate Better Than Water*, GATORADE (Feb. 24, 2026), https://www.gatorade.com/resources/how-gatorade-works-and-why-it-can-hydrate-better-than-water.

135. The market data confirms materiality. Nearly two out of three consumers report that ingredients have at least a moderate influence on their food and beverage purchases.[56] Approximately half of all United States consumers — and 79% of health-focused shoppers — report that they are worried about health risks from artificial ingredients and chemicals in foods.[57] Claims like "no artificial flavors" and "hydrates better than water" steer consumers toward, and induce them to pay more for, the products that bear them.

136. Moreover, hydration is the single most desired health benefit consumers seek from foods and beverages and the leading reason consumers give for purchasing a particular food or beverage.[58] Indeed, 56% of consumers report that hydration shapes their beverage choices.[59]

137. Defendants' own conduct confirms materiality. Defendants placed both representations on the front primary display panel — the space manufacturers reserve for the information they believe is most persuasive and most likely to drive a purchase. Defendants placed the "NO ARTIFICIAL" claim in the largest and boldest type on the package, inside a graphic chevron designed to draw the eye. Defendants built an entire product launch around the claim, describing it as "a new era of hydration." Defendants paid professional athletes and influencers to

---

[56] Lauren Manning, *Consumers are paying more attention to ingredient lists, report finds*, FOOD DIVE (Jun. 18, 2021), https://www.fooddive.com/news/consumers-are-paying-more-attention-to-ingredient-lists-report-finds/601925/.

[57] Danielle Romano, *U.S. Shoppers Are Concerned About Artificial Ingredients in Food*, CONVENIENCE STORE NEWS (Mar. 2, 2026), https://csnews.com/us-shoppers-are-concerned-about-artificial-ingredients-food#:~:text=Consumers%20report%20that%20they%20are,79%25%20of%20health%2Dfocused%20shoppers.

[58] *The Future of Water: Top Ten Trend #9*, INNOVA MARKET INSIGHTS (Apr. 18, 2024), https://www.innovamarketinsights.com/trends/the-future-of-water/.

[59] *Taste Still Drives Beverage Choice Among Consumers, Along with Hydration, Nutrition and Simplicity*, FOOD NAVIGATOR (Aug. 21, 2023), https://www.foodnavigator.com/Article/2023/08/21/Taste-still-drives-beverage-choice-among-consumers-along-with-hydration-nutrition-and-simplicity/.

repeat it. Defendants embedded it in the Products' names on Target and Walmart. Companies do not spend at that scale on claims they believe consumers ignore.

## V. CONSUMERS' INABILITY TO DISCOVER THE TRUTH

138. Plaintiffs and other reasonable consumers do not know, and have no reason to know, at the time of purchase, that the representations are false. The typical, reasonable consumer does not know that citric acid is near-exclusively produced through a complex synthetic manufacturing process involving *Aspergillus niger.*

139. Consumers do not work for Defendants. They have no access to Defendants' suppliers, specifications, or formulations. They cannot determine from a bottle whether the citric acid inside was fermented from *Aspergillus niger* in a stainless-steel vat or extracted from a lemon, and they have no way to test a comparative hydration claim. Average consumers do not possess the specialized knowledge of a chemist or a product developer.In any event, an ingredient list stating "citric acid" and "sodium citrate" would not have disclosed the truth. Those entries do not tell a consumer that the substances are manufactured from black mold, that they are classified as synthetic, or that they are what makes the drink taste tart and fruity. A consumer confronting the words "citric acid" next to a color depiction or photograph of, *e.g.*, cherries and the phrase "NATURALLY FLAVORED" would reasonably conclude the opposite of the truth. A back-panel ingredient list cannot cure an affirmative front-panel misrepresentation.

## VI. DEFENDANTS' KNOWLEDGE

140. Defendant PepsiCo is one of the largest food and beverage corporations *in the world.* Defendants formulate the Products. They select the suppliers. They know the provenance of every ingredient they buy, including whether the citric acid and sodium citrate they purchase in industrial quantities were fermented from *Aspergillus niger*. They know that essentially all commercially available citric acid is manufactured. They know their own published research on

hydration, because they published it. Defendants either knew the representations were false when they made them or would have known had they undertaken the diligence the law expects of them.

141. As for the Hydration Representation, Defendants' own history and research substantiate Plaintiffs' claims. On February 24, 2026, Defendants published an article on Gatorade.com titled "How Gatorade Works & Why It Can Hydrate Better Than Water."[60] The hedge in the title is itself telling: on the label, the claim is categorical; on Defendants' own science page, it is conditional.

142. The body of the article confirms the condition. Defendants write that "when it comes to hydration, water is essential," and that it is only "during longer or more intense workouts" that "your body loses more than just fluid, it loses electrolytes and energy." Defendants specify the threshold: the benefit arises "[d]uring exercise — especially sessions longer than 60 minutes." And Defendants describe the division of labor plainly: "Water replaces fluid. Gatorade products are formulated to help replace what sweat takes out." Defendants then state, in their own words, the precise opposite of what their label says: "[T]he goal isn't to replace water."

143. Defendants therefore know, and have publicly acknowledged, that the Products do not hydrate better than water as a general matter; that any advantage is conditional on sustained exertion most consumers do not undertake; and that the Products are not intended as a substitute for water. Defendants nevertheless print the unqualified claim "HYDRATES BETTER THAN WATER" on the front of every bottle and box, where consumers will see it — not Defendants' qualifications.

---

[60] *How Gatorade Works & Why It Can Hydrate Better Than Water*, GATORADE (Feb. 24, 2026), https://www.gatorade.com/resources/how-gatorade-works-and-why-it-can-hydrate-better-than-water (emphasis added).

144. A manufacturer may not make a categorical superiority claim on its packaging and bury the conditions that make the claim true on a webpage the consumer will never read. The label is the representation. The label is false.

145. Defendants have an obligation under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, to evaluate their marketing claims from the perspective of the reasonable consumer. Defendants were therefore statutorily obligated to consider whether the "No Artificial" and Hydration Representations, in isolation and in the context of the surrounding campaign, would lead reasonable consumers to believe the Products were flavored only with natural ingredients and hydrated better than water. Defendants either concluded that consumers would believe — which is why they made the claims — or failed to perform the required analysis.

146. Defendants exercise exclusive control over the Products' labels and advertising. They could have stopped at any time. They could have removed the representations. They could have reformulated the Products. They could have qualified the "No Artificial" and Hydration Representations on the label. They did none of these things. Despite receiving pre-suit notice, Defendants have continued to market the Products using the same representations.

## VII. THE PRICE PREMIUM AND RESULTING INJURY

147. Defendants charge a price premium for the Products, and that premium is tied directly to the "No Artificial" and Hydration Representations. By presenting the Products as free of artificial flavors and/or as hydrating better than water, Defendants positioned the Products as superior to competing beverages that truthfully disclose their ingredients and flavorings and/or make no unqualified hydration claim.

148. Plaintiffs and Class members paid that premium. They did not receive the benefit of their bargain. They purchased Products that, contrary to the front label, are flavored with

manufactured citric acid and sodium citrate, and/or that, contrary to the front label, do not hydrate better than water.

149. Defendants' conduct harms more than the individual purchaser. It distorts competition by giving Defendants an unearned advantage over lawfully acting competitors who either formulate their products without manufactured flavoring agents or decline to claim otherwise. And it erodes the reliability of front-panel labeling generally, on which the entire market for health-conscious food and beverage purchasing depends.

150. As a direct and proximate result, Plaintiffs and Class members were injured in that they: (1) overpaid for Products that were not what Defendants represented; (2) were deprived of the benefit of the bargain, because the Products were materially different from what was advertised; and (3) purchased Products with less value than Defendants represented them to have.

## CLASS ALLEGATIONS

151. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiffs bring this Action individually and on behalf of the following Classes:

> **No Artificial Nationwide Class:** All persons in the United States who, during the No Artificial Class Period, purchased any Product bearing a "No Artificial" Representation in the United States for personal, family, or household purposes and not for resale.
>
> **Hydration Nationwide Class:** All persons in the United States who, during the Hydration Class Period, purchased Classic Gatorade, Gatorade Zero, Lower Sugar Gatorade, or Gatorade Powder bearing the "HYDRATES BETTER THAN WATER" representation in the United States for personal, family, or household purposes and not for resale.

152. In the alternative to the Nationwide Classes, Plaintiffs bring this Action on behalf of the following State Subclasses, each defined as to both representations, with each Plaintiff representing the Subclass or Subclasses corresponding to the representation(s) on which that Plaintiff relied and the Product(s) that Plaintiff purchased:

> **California Subclass:** All persons who, during the applicable Class Period, purchased any Product bearing a challenged representation in the State of California for personal, family, or household purposes and not for resale.
>
> **New York Subclass:** All persons who, during the applicable Class Period, purchased any Product bearing a challenged representation in the State of New York for personal, family, or household purposes and not for resale.
>
> **Illinois Subclass:** All persons who, during the applicable Class Period, purchased any Product bearing a challenged representation in the State of Illinois for personal, family, or household purposes and not for resale.
>
> **Pennsylvania Subclass:** All persons who, during the applicable Class Period, purchased any Product bearing a challenged representation in the Commonwealth of Pennsylvania for personal, family, or household purposes and not for resale.

153. The No Artificial Nationwide Class and the Hydration Nationwide Class are referred to collectively as the "Nationwide Classes," and together with the State Subclasses as the "Class."

154. The "Class Period" is the period beginning on the earliest date permitted by the longest applicable statute of limitations for each claim asserted, through the date of judgment or until the conduct alleged herein ceases.

155. Excluded from the Class are: (i) Defendants and their parents, subsidiaries, affiliates, officers, directors, employees, agents, assigns, successors, and legal representatives; (ii) any entity in which Defendants have a controlling interest; (iii) federal, state, and local governments, including their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and subdivisions; (iv) any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff; and (v) all resellers of the Products.

156. Plaintiffs reserve the right to modify, amend, or refine the Class definitions, including by adding or modifying subclasses, in response to information learned through discovery, positions taken by Defendants, or otherwise, prior to or in connection with a motion for class certification.

157. The members of the Class are so numerous that joinder of all members is impracticable. Defendants sold more than $7.5 billion of Gatorade product in a single year and hold approximately 60% of the U.S. sports drink market. Upon information and belief, each Nationwide Class consists of hundreds of thousands, if not millions, of purchasers dispersed throughout the United States, and each State Subclass consists of thousands of purchasers or more. The precise number and identities of Class members are ascertainable from Defendants' records, retailer records, and other information in the parties' possession.

158. There are numerous questions of law and fact common to the Class that are capable of class wide resolution, including:

a. whether the citric acid in the "No Artificial" Products is manufactured citric acid derived from *Aspergillus niger* fermentation;

b. whether manufactured citric acid in the "No Artificial" Products is an artificial ingredient;

c. whether manufactured citric acid functions as a flavoring in the "No Artificial" Products;

d. whether the sodium citrate in the "No Artificial" Products is an artificial ingredient;

e. whether sodium citrate functions as a flavoring in the "No Artificial" Products;

f. whether the "No Artificial" Representations are false, misleading, or likely to deceive a reasonable consumer;

g. whether the Products hydrate better than water for a reasonable consumer;

h. whether the Hydration Representation is false, misleading, or likely to deceive a reasonable consumer;

i. whether the challenged representations are material to a reasonable consumer;

j. whether Defendants knew or should have known that the challenged representations were false or misleading;

k. whether Defendants' conduct violates the consumer protection statutes pled herein;

l. whether Defendants breached express warranties;

m. whether Defendants were unjustly enriched;

n. whether the Products commanded a price premium attributable to the challenged representations, and the amount of that premium; and

o. the appropriate measure of class wide damages and restitution.

159. These common questions predominate. The central issues in this case — what the Products contain, where those ingredients come from, what the label says, and whether the label is true — are answered by evidence about Defendants' own conduct, formulations, suppliers, and marketing. They do not vary from purchaser to purchaser.

160. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like every Class member, purchased Products bearing uniform misrepresentations on the front label, relied on those representations, and paid a premium as a result. Plaintiffs' claims arise from the same course of conduct, the same representations, and the same legal theories as the claims of the Class. There are no defenses unique to Plaintiffs.

161. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to or in conflict with those of the Class and seek no relief adverse to Class members. Plaintiffs have retained counsel with substantial experience prosecuting consumer protection class actions, including food and beverage mislabeling actions, who have committed the resources necessary to prosecute this Action vigorously.

162. Questions of law and fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, because:

a. the individual claims are small relative to the cost of litigating them, such that few if any Class members could afford to, or would, seek redress individually;

b. absent Class members have no substantial interest in individually controlling the prosecution of separate actions;

c. Defendants' conduct was uniform across the Class, and the challenged representations appeared on every unit sold;

d. the applicable legal standards are consistent and susceptible to common proof;

e. concentrating the litigation in a single forum conserves judicial resources and avoids duplicative discovery and inconsistent adjudications;

f. without a class action, many Class members will remain unaware of their claims, and Defendants will retain the proceeds of their conduct; and

g. this Action presents no unusual difficulties in management, and adequate notice can be provided to Class members using information in the parties' records and through customary means.

163. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

164. In the alternative, Plaintiffs seek certification of particular issues under Rule 23(c)(4), including the issues identified in the commonality allegations above.

## CAUSES OF ACTION

### COUNT I
**Deceptive Acts and Practices**
**N.Y. Gen. Bus. Law § 349**
(*By Plaintiff Greenberg Ulberg on Behalf of the New York Subclass)*

165. Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

166. New York General Business Law § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

167. Defendants' conduct was consumer oriented. Defendants marketed and sold the Products to the consuming public at large, through nationwide retail distribution and nationwide advertising, and the challenged representations appeared on every unit sold.

168. Defendants committed deceptive acts and practices by representing that the "No Artificial" Products contain "no artificial flavors, sweeteners, or added colors," "no added colors or artificial flavors," "no artificial sweeteners or flavors," and that the Products are "Naturally Flavored" or "Naturally Flavored with Other Natural Flavors," when in fact the Products are flavored with manufactured citric acid and sodium citrate.

169. Defendants also committed deceptive acts and practices by representing, without qualification, that the Products "HYDRATE[] BETTER THAN WATER."

170. These acts and practices are materially misleading. A reasonable consumer acting reasonably under the circumstances would understand the No Artificial Representations to mean that no human-manufactured substance imparts flavor to the Products. Manufactured citric acid and sodium citrate do exactly that.

171. Moreover, for most consumers — those not engaged in sustained exertion producing significant sweat loss — the Products provide no hydration advantage over water at all and instead deliver unnecessary sugar and sodium. Defendants' own published research confirms that any advantage is confined to exercise sessions exceeding sixty minutes, and Defendants have publicly acknowledged that "the goal isn't to replace water."

172. A reasonable consumer acting reasonably under the circumstances would understand an unqualified, bold, capitalized comparative claim on the front of a bottle to mean what it says. Defendants' contrary qualifications, published only on a webpage the consumer will not read at the point of sale, do not cure the deception.

173. The deception is compounded by Defendants' placement of photorealistic color fruit imagery immediately adjacent to the claims, and by Defendants' repetition of the claims across their website, social media, paid athlete and influencer promotions, and third-party retail listings, including in the Products' names.

174. Information regarding the provenance and function of the ingredients in the Products was within Defendants' exclusive control. Plaintiffs could not have discovered the falsity of the representations through the exercise of reasonable diligence.

175. Plaintiffs suffered injury as a result. They paid a price premium for Products that did not have the advertised attribute, and they would not have purchased the Products, or would have paid substantially less, had they known the truth.

176. Defendants' conduct occurred in New York and emanated from New York: Defendant PepsiCo is headquartered in this State and District, and upon information and belief the challenged representations were developed, reviewed, approved, and disseminated from Defendants' New York headquarters.

177. Plaintiffs seek to recover their actual damages or fifty dollars, whichever is greater, and, together with reasonable attorneys' fees and costs. N.Y. Gen. Bus. Law § 349(h).

## COUNT II
**False Advertising**
**N.Y. Gen. Bus. Law § 350**
*(By Plaintiff Greenberg Ulberg on Behalf of the New York Subclass)*

178. Plaintiffs incorporate by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

179. New York General Business Law § 350 declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Section 350-a defines false advertising as advertising "if such advertising is misleading in a material respect."

180. Defendants engaged in consumer-oriented advertising that was deceptive and misleading in a material way. Defendants advertised the "No Artificial" Products as containing no artificial flavors and as naturally flavored, on the Products' labels, on Gatorade.com, on YouTube, on Instagram and Facebook, through paid athletes and influencers, and on the Amazon, Walmart, and Target platforms.

181. The advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances because the "No Artificial" Products are flavored with manufactured citric acid and sodium citrate and because for most consumers, the Products provide no hydration advantage over water and instead delivery unnecessary sugar and sodium.

182. Defendants knew or should have known that the advertising was untrue and misleading. Defendants formulate the Products, select their suppliers, and know the provenance of their ingredients.

183. Defendants' false advertising has resulted in injury to Plaintiffs, the other New York Class members, and the public interest. Indeed, Plaintiffs overpaid for the Products and were deprived of the benefit of their bargain.

184. Plaintiffs seek to recover their actual damages or five hundred dollars, whichever is greater together with reasonable attorneys' fees and costs. N.Y. Gen. Bus. Law § 350-e.

**COUNT III**
**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750, *et seq*.**
*(By Plaintiffs Mignosi, Walsh, Smith, Darr, and Kononenko on Behalf of the California Subclass)*

185. Plaintiffs incorporate by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

186. The CLRA declares unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

187. The Products are "goods" within the meaning of Civil Code § 1761(a). Defendants are each a "person" within the meaning of § 1761(c). Plaintiffs and the other California Subclass members are "consumers" within the meaning of § 1761(d). Plaintiffs' purchases of the Products are also "transactions" within the meaning of § 1761(e).

188. Defendants violated the CLRA by making the "No Artificial" Representations and by making the Hydration Representations in transactions intended to result in, and which did result in, the sale of the Products to Plaintiffs and the California Subclass, specifically: § 1770(a)(5), by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have"; § 1770(a)(7), by representing that the Products are "of a particular standard, quality, or grade . . . [when] [they are] of another"; and § 1770(a)(9), by advertising the Products "with [the] intent not to sell [them] as advertised."

189. Defendants' representations were uniform, material, and likely to deceive, and Defendants knew or should have known that they were untrue and misleading.

190. Plaintiffs and the other California Subclass members relied on the "No Artificial" and Hydration Representations in deciding to purchase the Products in that those representations were a material factor in their purchasing decisions. A reasonable consumer would consider them important in deciding whether to purchase the Products.

191. Plaintiffs and the other California Subclass members could not reasonably have avoided the injury, because they were unaware of the facts Defendants failed to disclose and had no means of discovering them at the point of sale.

192. As alleged above, on or around September 29, 2025, May 26, 2026, and June 22, 2026, more than thirty days prior to the assertion of a damages claim under the CLRA, counsel notified Defendants in writing, by certified mail, return receipt requested, of the particular violations of § 1770 alleged herein and demanded that Defendants rectify the conduct. Defendants failed to do so. Plaintiffs therefore seek damages under Civil Code § 1780(a)(1), in addition to any other relief available under § 1780, restitution under § 1780(a)(3), punitive damages under § 1780(a)(4), and attorneys' fees and costs under § 1780(e).

193. Defendants' conduct also warrants punitive damages. Defendants intentionally misrepresented material facts to induce consumers to pay for attributes the Products do not have, in knowing disregard of consumers' rights, and that conduct was committed, authorized, adopted, approved, or ratified by Defendants' officers, directors, and managing agents.

**COUNT IV**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
*(By Plaintiffs Mignosi, Walsh, Smith, Darr, and Kononenko on Behalf of the California Subclass)*

194. Plaintiffs incorporate by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

195. The UCL prohibits, and provides civil remedies for, "unfair competition," which it defines to "mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Each prong is independently actionable.

196. Defendants' conduct is unlawful because it violates other laws, each of which is independently actionable through the UCL, including the CLRA, Cal. Civ. Code §§ 1750, *et seq*.; the FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*.; Cal. Bus. & Prof. Code § 17531; and Cal. Civ. Code §§ 1572, 1573, 1709, 1710, and 1711.

197. Defendants' conduct further constitutes a knowing failure to adopt policies in accordance with, and adherence to, applicable law — obligations that are binding upon and burdensome to Defendants' lawfully acting competitors. That failure engenders an unfair competitive advantage for Defendants.

198. Defendants' conduct is also unfair. Under the UCL, a business practice is "unfair" when the injury it causes outweighs any benefit it provides to consumers and the injury is one consumers themselves could not reasonably avoid. Moreover, the utility of Defendants' conduct is outweighed by the gravity of the harm to Plaintiffs and Class members. The unfairness of Defendants' conduct is also tethered to legislatively declared policies and has had an actual or threatened impact on competition.

199. Mislabeling the Products with the "No Artificial" and Hydration Representations confers no benefit on consumers; it causes them to receive products inconsistent with their reasonable expectations and to overpay. Consumers cannot avoid the injury, because the falsity is undiscoverable at the point of sale. The utility of the conduct is zero. And the conduct is tethered

to the legislatively declared policies embodied in the CLRA, California False Advertising Law, and threatens actual injury to competition by disadvantaging competitors who label truthfully.

200. Defendants' conduct is also fraudulent because it is likely to deceive members of the public. Defendants made the "No Artificial" and Hydration Representations with the intent that consumers rely on them in purchasing the Products. The representations are false, material, and likely to deceive the reasonable consumer, for the reasons alleged throughout this Complaint.

201. Defendants failed to avail themselves of reasonably available, lawful alternatives to further any legitimate business interest. Defendants could have refrained from making the "No Artificial" Representations. Alternatively, Defendants could have formulated the Products without manufactured citric acid and sodium citrate.

202. Defendants also could have omitted the Hydration Representation or could have qualified it on the label in the same terms Defendants use on their own website — "can hydrate better than water," "during exercise sessions longer than 60 minutes."

203. All the conduct alleged herein occurs and continues to occur during Defendants' business and is part of a pattern and generalized course of conduct repeated daily, which will continue until Defendants alter their conduct or are ordered to do so.

204. Plaintiffs and the California Subclass suffered injury in fact and lost money or property because of, and in reliance upon, Defendants' conduct. They paid an unwarranted premium for Products that do not have the advertised attribute.

## COUNT V
**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq*.**
*(By Plaintiffs Mignosi, Walsh, Smith, Darr, and Kononenko on Behalf of the California Subclass)*

205. Plaintiffs incorporate by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

206. The FAL makes it unlawful for any person to dispose of property, or to induce the public to enter into any obligation relating thereto, by means of any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

207. Defendants violated § 17500 by disseminating the "No Artificial" and the Hydration Representations to the public through the Products' labeling, packaging, advertising, website, social media, paid promotions, and third-party retail listings, with the intent to induce the public to purchase the Products.

208. The representations are untrue because the Products are flavored with manufactured citric acid and sodium citrate and because for most consumers, the Products provide no hydration advantage over water and instead delivery unnecessary sugar and sodium. They are misleading because they are likely to deceive a reasonable consumer. They are material because a reasonable consumer would consider them important in deciding whether to purchase the Products.

209. In making and disseminating the representations, Defendants knew or by the exercise of reasonable care should have known that they were untrue or misleading. Indeed, regarding the Hydration Representation, Defendants even published contradicting science themselves.

210. Plaintiffs and the other California Subclass members suffered injury in fact and lost money or property because of Defendants' violations, and seek restitution, disgorgement, and all other relief available under §§ 17203 and 17535.

**COUNT VI**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") 815 ILCS 505/1, *et seq*.**
*(By Plaintiff Leam on Behalf of the Illinois Subclass)*

211. Plaintiff Leam incorporates by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

212. The ICFA prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact . . . in the conduct of any trade or commerce." 815 ILCS 505/2. Plaintiff and the other Illinois Subclass members are "consumers" and Defendants engaged in "trade or commerce" within the meaning of the statute.

213. Defendants committed deceptive acts and practices by making the Hydration Representation. This representation was made in the course of trade or commerce and intended that Plaintiff and the Illinois Subclass rely on it. The deception proximately caused actual damage: Plaintiff and the Illinois Subclass paid a price premium for Products that lacked the advertised attribute. Plaintiff and the other Illinois Subclass members seek actual damages, punitive damages, attorneys' fees and costs and all other relief available pursuant to 815 ILCS 505/10a.

**COUNT VII**
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") 73 P.S. §§ 201-1, *et seq*.**
*(By Plaintiff Mahoney on Behalf of the Pennsylvania Subclass)*

214. Plaintiffs incorporates by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

215. The UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," including "[r]epresenting that goods .

. . have . . . characteristics . . . [or] benefits . . . that they do not have," "[r]epresenting that goods . . . are of a particular standard, quality or grade . . . if they are of another," "[a]dvertising goods or services with intent not to sell them as advertised," and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(v), (vii), (ix), (xxi).

216. Specifically, Defendants deceived Plaintiffs and the Pennsylvania Class by disseminating the "No Artificial" and the Hydration Representations to the public through the Products' labeling, packaging, advertising, website, social media, paid promotions, and third-party retail listings, with the intent to induce the public to purchase the Products.

217. The representations are untrue because the Products are flavored with manufactured citric acid and sodium citrate and because for most consumers, the Products provide no hydration advantage over water and instead delivery unnecessary sugar and sodium. They are misleading because they are likely to deceive a reasonable consumer. They are material because a reasonable consumer would consider them important in deciding whether to purchase the Products.

218. Plaintiffs and the other Pennsylvania Subclass members purchased the Products primarily for personal, family, or household purposes. They justifiably relied on the "No Artificial" and Hydration Representations and suffered ascertainable loss of money as a result, in the form of the price premium.

219. Plaintiff Mahoney and the other Pennsylvania Subclass members seek actual damages or one hundred dollars, whichever is greater, treble damages, attorneys' fees and costs, and such additional relief as the Court deems necessary or proper, pursuant to 73 P.S. § 201-9.2.

## COUNT VIII
**Breach of Express Warranty**
(*On Behalf of the No Artificial and Hydration Nationwide Classes and, in the Alternative, the State Subclasses*)

220. Plaintiffs incorporate by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

221. Through the "No Artificial" Representations, Defendants made affirmations of fact and descriptions of the goods to Plaintiffs and Class members: that the "No Artificial" Products contain no artificial flavors and are naturally flavored. Those affirmations of fact and descriptions were made on the front label of every unit sold and throughout Defendants' advertising, were relied upon by Plaintiffs and Class members, and became part of the basis of the bargain, thereby creating express warranties that the Products would conform to them. See U.C.C. § 2-313 and its state-law analogues. The Products did not conform. The "No Artificial" Products are flavored with manufactured citric acid and sodium citrate, both of which are artificial.

222. Through the Hydration Representation, Defendants made an affirmation of fact and description of the goods to Plaintiffs and Class members: that the Products hydrate better than water. That affirmation appeared on the front of every unit the Products sold during the Class Period, was relied upon by Plaintiffs and Class members, and became part of the basis of the bargain, thereby creating an express warranty that the Products would conform to it. The Products did not conform. For the ordinary consumer, the Products do not hydrate better than water.

223. Defendants thereby breached the express warranties. All conditions precedent to Defendants' liability have been performed or have occurred, or are excused.

224. Defendants received timely notice of the breach, as alleged above, and in any event had actual knowledge of the nonconformity. Any additional notice requirement is excused as futile, because Defendants have continued the conduct notwithstanding notice.

225. Privity is not required where, as here, the warranty is created by representations on the product label directed to and relied upon by the ultimate purchaser, and Defendants are the

manufacturers who made those representations. To the extent privity is required, it is satisfied because Defendants made the representations directly to Plaintiffs and Class members through the labels, packaging, and advertising on which they relied, and because Plaintiffs and Class members are the intended third-party beneficiaries of Defendants' contracts with retailers.

226. As a direct and proximate result of the breach, Plaintiffs and Class members did not receive goods as warranted and did not receive the benefit of their bargain. They have been damaged in an amount to be proven at trial.

## COUNT IX

**Unjust Enrichment / Restitution (Pleaded in the Alternative)**

(*On Behalf of the No Artificial and Hydration Nationwide Classes, and, in the Alternative, the State Subclasses*)

227. Plaintiffs incorporate by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

228. This claim is pleaded in the alternative to Plaintiffs' statutory and warranty-based claims, pursuant to Federal Rule of Civil Procedure 8(d).

229. By purchasing the Products, Plaintiffs and Class members conferred a benefit on Defendants in the form of the purchase price, including the premium attributable to the "No Artificial" and Hydration Representations.

230. Defendants had knowledge of and appreciated that benefit. Defendants track their sales, and but for consumers' purchases, Defendants would not generate revenue from the Products.

231. Defendants' retention of that benefit is inequitable and unjust, because the benefit was obtained through false, misleading, and deceptive representations regarding an attribute the Products do not possess.

232. Equity and good conscience require restitution and disgorgement of the amounts by which Defendants have been unjustly enriched.

**COUNT X**
**Fraud**
(*On Behalf of the No Artificial and Hydration Nationwide Classes, and, in the Alternative, the State Subclasses*)

233. Plaintiffs incorporate by reference each of the foregoing allegations between paragraphs 1 and 164 as though fully set forth herein.

234. Defendants represented that the "No Artificial" Products contain "no artificial flavors, sweeteners, or added colors," "no artificial flavors, sweeteners, or colors from artificial sources," "no added colors or artificial flavors," and "no artificial sweeteners or flavors," and that the Products are "Naturally Flavored" and "Naturally Flavored with Other Natural Flavors."

235. Defendants made these "No Artificial" Representations on the front primary display panel of the Products' labels and packaging, including multipacks; on gatorade.com, including in the Products' listing and under "Product Details"; in press releases issued March 4, 2026; in video advertising on YouTube titled "Introducing Gatorade Lower Sugar: No Artificial Flavors, Sweeteners, or Colors"; on Defendants' verified Instagram and Facebook accounts, including the March 4, 2026 post featuring Candace Parker and Caitlin Clark; in paid promotional videos featuring Claire Kittle and Roland Pollard; and on the Amazon, Walmart, and Target platforms, including in the Products' titles and "Special Ingredients" and "Features" fields.

236. Defendants made these "No Artificial" Representations throughout the Class Period, including in connection with the March 2026 launch of Lower Sugar Gatorade and continuing through the present.

237. Defendants acting through their officers, directors, employees, agents, and paid partners, including Anuj Bhasin, Gatorade's Senior Vice President of Marketing, who publicly

described the campaign as offering "the flavors they know and love, but with no artificial flavors, sweeteners or colors."

238. The "No Artificial" Representations were false when made. The "No Artificial" Products are flavored with manufactured citric acid derived from *Aspergillus niger* fermentation and with sodium citrate, a synthetic byproduct of that process. Both are artificial. Both impart flavor. Both appear on the ingredients list ahead of "natural flavor."

239. Defendants knew the "No Artificial" Representations were false when they made them, or made them recklessly without regard for their truth. Defendants formulate the Products and select their suppliers. Defendants know that approximately 99% of commercial citric acid is manufactured from black mold. Defendants had before them two decades of FDA warning letters, published USDA technical reports classifying citric acid as synthetic, and appellate authority holding that a jury could find manufactured citric acid not natural.

240. Defendants made the "No Artificial" Representations with the intent that Plaintiffs and Class members rely on them in deciding to purchase the Products. That intent is evidenced by Defendants' placement of the claims on the front panel in the largest type, by Defendants' construction of an entire product launch around them, and by Defendants' payment of athletes and influencers to repeat them.

241. So too for the Hydration Representation: Defendants made the Hydration Representation uniformly across all Products, in advertisements, on third party retailer websites, and on social media posts.

242. Defendants made these Hydration Representation throughout the Class Period.

243. Defendants knew the Hydration Representations were false when they made them and have even published articles undermining the unqualified Hydration Representation that

appears on Product packaging. Defendants knew at all relevant times that the Products do not, in ffact, "hydrate better than water" for most consumers.

244. Defendants made the Hydration Representation with the intent that Plaintiffs and Class members rely on them in deciding to purchase the Products. That intent is evidenced by Defendants' prominent placement of the claims on the front panel in the largest type, and by Defendants robust advertising campaign highlighting the "Hydration" Representation.

245. Plaintiffs and Class members justifiably relied on the "No Artificial" and Hydration Representations. Reliance was justified because the representations were unambiguous, appeared on the packaging itself, were repeated across every channel through which the Products were sold, and concerned facts within Defendants' exclusive knowledge.

246. As a direct and proximate result, Plaintiffs and Class members suffered injury in fact and lost money, in the amount of the price premium attributable to the false representations, in an amount to be proven at trial.

247. Defendants' conduct was intentional, malicious, oppressive, and fraudulent, and was committed, authorized, adopted, approved, or ratified by Defendants' officers, directors, and managing agents. Plaintiffs seek punitive damages to the extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

A. An order certifying the Nationwide Classes and each State Subclass pursuant to Federal Rule of Civil Procedure 23(b), or in the alternative certifying particular

issues pursuant to Rule 23(c)(4); appointing Plaintiffs as Class Representatives; and appointing Plaintiffs' counsel as Class Counsel pursuant to Rule 23(g);

B. A declaration that Defendants' conduct violates the statutes and common law referenced herein;

C. Judgment in favor of Plaintiffs and the Class on all counts asserted herein;

D. An award of actual, compensatory, and statutory damages, including treble damages where permitted by statute, in amounts to be determined at trial;

E. An order awarding restitution, disgorgement of Defendants' ill-gotten gains, and all other forms of equitable monetary relief, consistent with applicable law and pursuant only to those causes of action that so permit;

F. An award of punitive and exemplary damages, statutory penalties, and monetary fines, consistent with applicable law and pursuant only to those causes of action that so permit;

H. An award of pre-judgment and post-judgment interest on all amounts awarded;

I. An award of Plaintiffs' reasonable attorneys' fees, expenses, and costs of suit, as provided by statute or otherwise; and

J. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, individually and on behalf of all others similarly situated, demand a trial by jury on all claims and issues so triable.

DATED: September 14, 2026

*__/s/ Laurence D. King__*
Laurence D. King
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1501
Oakland, California 94612
lking@kaplanfox.com

Tel: (415) 772-4704

Aaron Schwartz
**KAPLAN FOX & KILSHIEMER LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: 212-687-1980
aschwartz@kaplanfox.com

*/s/ Blake Hunter Yagman*
Blake Hunter Yagman
**YAGMAN PLLC**
Forest Hills Tower
118-35 Queens Boulevard, Suite 444
Forest Hills, New York 11375
*blake.yagman@yagmanpllc.com*
Tel: (929) 709-1493

*/s/ Michael R. Reese*
Michael R. Reese
**REESE LLP**
100 West 93rd St, 16th Floor
New York, New York 10025
mreese@reesellp.com
Tel: (212) 643-0500

*Interim Co-Lead Class Counsel*